Argued and submitted May 10, 2000, decision of Court of Appeals and judgment of circuit court affirmed May 10, 2001

Linda McCATHERN,
*Respondent on Review,*

*v.*

TOYOTA MOTOR CORPORATION,
a foreign corporation,
Toyota Motor Sales, Inc.,
a foreign corporation, and
Broadway Toyota,
an Oregon corporation,
*Petitioners on Review,*

*and*

TAKATA CORPORATION,
a foreign corporation,
*Defendant.*

(CC 9601-00689; CA A98578; SC S46683)

23 P3d 320

Malcolm E. Wheeler, of Wheeler Trigg & Kennedy, P.C., Denver, Colorado, argued the cause for petitioners on review. With him on the briefs were Jonathan M. Hoffman and Julie K. Bolt, of Martin, Bischoff, Templeton, Langslet & Hoffman, LLP, Portland.

Kathryn H. Clarke, Portland, argued the cause for respondent on review. With her on the brief were Maureen Leonard, Jeffrey P. Foote, and Jana Toran, Portland.

Arthur C. Johnson, of Johnson, Clifton, Larson, & Corson, P.C., Eugene, filed a brief for *amicus curiae* Oregon Trial Lawyers Association. With him on the brief were Douglas G. Schaller and James E. Beard.

Karen O'Kasey, of Schwabe, Williamson & Wyatt, Portland, filed a brief for *amicus curiae* Oregon Association of Defense Counsel.

Christopher W. Angius, of Perkins Coie, Portland, and Victor E. Schwartz, Mark A. Behrens, and Leah Lorber, of Crowell & Moring, LLP, Washington, D.C., filed a brief for *amicus curiae* Product Liability Advisory Council, Inc. Also appearing on the brief was Of Counsel Hugh F. Young, Jr., Product Liability Advisory Council, Inc., Reston, Virginia.

Before Carson, Chief Justice, and Gillette, Durham, Kulongoski, Leeson, and Riggs, Justices.[**]

KULONGOSKI, J.

---

[**] Van Hoomissen, J., retired December 31, 2000, and did not participate in the decision of this case. De Muniz, J., did not participate in the consideration or decision of this case.

## KULONGOSKI, J.

The primary issue on review in this product liability civil action is whether plaintiff introduced sufficient evidence to establish that the 1994 Toyota 4Runner was designed defectively.[1] Plaintiff was injured when the 1994 4Runner vehicle in which she was riding as a passenger rolled over. Plaintiff sued defendants—the manufacturer, distributor, and seller of the 4Runner—alleging that the 1994 4Runner was dangerously defective and unreasonably dangerous because its design rendered it unstable and prone to roll over. A jury returned a verdict in favor of plaintiff and awarded noneconomic damages totaling $2,250,000 and economic damages totaling $5,400,000. The Court of Appeals affirmed. *McCathern v. Toyota Motor Corp.*, 160 Or App 201, 985 P2d 804 (1999). We now affirm the decision of the Court of Appeals.

The following facts are taken from the record. We view the evidence, and the reasonable inferences to be drawn therefrom, in the light most favorable to the party in whose favor the jury returned the verdict, *i.e.*, plaintiff. *Parrott v. Carr Chevrolet, Inc.*, 331 Or 537, 542, 17 P3d 473 (2001).

The accident that caused plaintiff's injuries took place one evening in May 1995, when plaintiff and her daughter, together with plaintiff's cousin, Sanders, and her daughter, were riding in Sanders's 1994 Toyota 4Runner. Sanders was driving, plaintiff was in the front passenger seat, and the children were in the back seat. Everyone was wearing a seatbelt.

---

[1] ORS 30.900 defines a "product liability civil action" as a

"civil action brought against a manufacturer, distributor, seller or lessor of a product for damages for personal injury, death or property damage arising out of:

"(1) Any design, inspection, testing, manufacturing or other defect in a product;

"(2) Any failure to warn regarding a product; or

"(3) Any failure to properly instruct in the use of a product."

Of the three types of product liability civil actions that ORS 30.900 describes—manufacturing defects, design defects, and warning or instruction deficiencies—we are concerned in this proceeding only with design defect.

While the group was traveling south on Highway 395 at a speed of approximately 50 miles per hour, an oncoming vehicle veered into Sanders's lane of travel.[2] Sanders steered to the right onto the paved shoulder to avoid a collision, then steered to the left to stay on the highway, at which point the 4Runner began to rock from side-to-side. She then steered to the right again to return to the south-bound lane, at which point the 4Runner rolled over and landed upright on its four wheels. During the rollover, the roof over the front passenger seat collapsed and, as a result, plaintiff sustained serious and permanent injuries. The other passengers in the 4Runner sustained only cuts and bruises. The vehicle that had veered into Sanders's lane did not stop, and no other vehicles were involved in the accident.

In January 1996, plaintiff filed the present action against defendants (collectively "Toyota").[3] Plaintiff's complaint alleged that the 1994 4Runner "was dangerously defective and unreasonably dangerous in that the vehicle, as designed and sold, was unstable and prone to rollover."[4]

At trial, plaintiff presented expert testimony in support of her theory that the 1994 4Runner was designed defectively. One of plaintiff's accident reconstruction experts, Fries, opined that the accident was caused solely by the geometry of the 1994 4Runner, as opposed to any other tripping mechanism, such as braking, off-road travel, or a "rim trip."[5] Robertson, a statistician specializing in injury statistics, testified regarding the correlation between the height of a vehicle's center of gravity, its track width,[6] and its rollover

---

[2] Highway 395 is a two-lane paved highway with wide, paved shoulders. At the location of the accident, the highway was flat, smooth, and, on the night of plaintiff's accident, dry.

[3] The trial court dismissed Takata Corporation from the case, and it is not a party on review.

[4] Plaintiff also alleged that Toyota was negligent in failing to design and sell a vehicle that provided adequate resistance to rollover. On Toyota's motion for a directed verdict at the close of plaintiff's evidence, ORCP 60, the trial court dismissed plaintiff's negligence claim. That ruling is not at issue on review.

[5] A "rim trip" occurs when a tire debeads, or breaks down, and the wheel rim gouges into the pavement, creating a sideways force that can cause the vehicle to roll over.

[6] "Track width" is the distance between the center of each front tire.

resistence. Robertson stated that the 1994 4Runner was unreasonably dangerous because widening the vehicle by only eight inches would have increased its stability and decreased its propensity to roll over. Tamny, another engineer and accident reconstruction expert, also opined that the 1994 4Runner was unreasonably dangerous because the manufacturer could have designed it in such a way that it would have skidded instead of rolling over when making sharp turns on flat, dry pavement.

Beginning with its opening statement and continuing throughout the trial, Toyota conceded that it was aware that the 1994 4Runner rolls over on flat, dry pavement due to tire friction forces alone. According to Toyota, however, the 1994 4Runner's design was not defective because almost all sport utility vehicles (SUVs) will roll over under conditions similar to those present during plaintiff's accident.[7] Toyota conceded that the design modifications that plaintiff's experts had suggested—lowering the vehicle's center of gravity or widening its track width to increase rollover resistance—were *feasible* at the time the 1994 model 4Runner was designed. Toyota argued, however, that those changes were *not practicable* because they would have diminished the 4Runner's utility and inhibited its performance in an off-road environment.

Plaintiff also presented evidence that Toyota had redesigned the 1994 model 4Runner in 1996 by lowering its center of gravity and widening its track width. Toyota's senior staff engineer, Yonekawa, testified that the design modifications made to the 1996 4Runner had improved the vehicle's handling and rollover resistance. In Toyota's testing, the 1994 model 4Runner had overturned at speeds of less than 40 miles per hour with steering input alone, *i.e.*, without applying the brakes. By contrast, the 1996 4Runner did not roll over with steering input alone. According to plaintiff's expert, Tamny, "if you have to hit the brakes to make the vehicle unstable, it has better handling characteristics than if you

---

[7] A multipurpose vehicle, like the Toyota 4Runner, is classified by the National Highway Traffic Safety Administration as a "sport utility vehicle," based on specific design characteristics, such as high ground clearance, that enable the vehicle to perform in a variety of off-road applications.

can get it to lift off from steering alone." Tamny also characterized the 1996 4Runner as a reasonably safe vehicle because, when a driver makes an "obstacle avoidance maneuver"[8] on flat, dry pavement, the 1996 design slides or skids to a stop, and does not roll over. Finally, Dobashi, Toyota's engineer who was responsible for testing and evaluating the 1996 4Runner, also testified that the 1996 design changes had improved the handling and stability of the 4Runner. When asked whether the 1996 4Runner was worse in any respect than the 1994 model, *i.e.*, whether the design modifications of the 1996 4Runner had affected its utility as an SUV, Dobashi testified that, to his knowledge, "all performances are about the same or better."

Finally, to counter the argument that no ordinary consumer would expect a 4Runner to stay upright during evasive turns, plaintiff presented evidence that Toyota had promoted the 1994 4Runner as a safe and dependable vehicle for both highway and off-road purposes. Toyota's national merchandising manager for the United States, Cecconi, testified that Toyota had marketed the 1994 4Runner to older, wealthier drivers who would use the vehicle for commuting as well as for outdoor activities. According to Cecconi, Toyota was aware that many consumers thought that the 4Runner's height was a safety feature because it allowed better visibility. He also admitted, however, that Toyota's advertising did not attempt to communicate to consumers the rollover risk attendant with the vehicle's height. When presented with an example of a television commercial depicting the 4Runner performing evasive maneuvers similar to those that occurred in plaintiff's accident, Cecconi admitted that, under certain conditions, the maneuvers being depicted in the commercial might cause the vehicle to roll over. Cecconi also was shown several Toyota advertising brochures and testified that he was "not really sure" whether the 1994 4Runner safely could perform the evasive maneuvers depicted in the brochures diagrams.

At the close of plaintiff's evidence, Toyota moved for a directed verdict on plaintiff's design-defect claim on two

---

[8] "Obstacle avoidance maneuver" was the phrase that Tamny used to describe the series of turns that Sanders had made on the night of the accident.

grounds: (1) that plaintiff had failed to prove that the 1994 4Runner was dangerously defective and unreasonably dangerous because she had failed to adduce sufficient evidence of the practicability of her proposed alternative design, *viz.*, the 1996 4Runner; and (2) that plaintiff had failed as a matter of law to prove that the design of the 1994 4Runner had caused her injuries because she had failed to demonstrate that it was more probable than not that the accident and injuries would not have occurred had Toyota manufactured and sold the product with plaintiff's proposed alternative design. The court denied Toyota's motion on both grounds. Toyota renewed that motion on the same two grounds at the close of the evidence, and the court again denied the motion.

As noted, the jury found for plaintiff, awarding her economic and noneconomic damages. Toyota timely filed a motion for judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial, based on the same grounds as its earlier motion for a directed verdict. The trial court did not rule on the motion, and it therefore was denied by operation of law. ORCP 63 D; ORCP 64 F.

On appeal, the Court of Appeals concluded that the trial court did not err in denying Toyota's motions for directed verdict and JNOV because plaintiff had submitted evidence from which a jury could have concluded that the 1994 4Runner had failed to meet ordinary consumer expectations and, therefore, was defective. *McCathern*, 160 Or App at 204. After reviewing the history of "the controlling standard of strict products liability under Oregon law: the 'consumer expectation' test," *id.* at 207, the Court of Appeals held that a plaintiff in Oregon could establish defective design by proving ordinary consumer expectations under either a "representational" theory, a "consumer risk-utility" theory, or both. *Id.* at 218. The court also concluded that plaintiff's proof legally was sufficient under both theories. *Id.* at 222, 228.

Toyota petitioned for review, renewing its contention that plaintiff had failed to introduce sufficient evidence to support her design-defect claim. We allowed review to consider that issue. Before we reach that issue, however, we consider an additional issue raised in Toyota's petition for review

concerning the trial court's admission of "other similar incidents" evidence.

At trial, plaintiff presented expert testimony by Wallingford, a forensic engineer specializing in accident reconstruction. Plaintiff had retained Wallingford to review approximately 35 rollover accidents involving pre-1996 Toyota 4Runners to determine whether those accidents were "substantially similar" to plaintiff's accident. The majority of Wallingford's testimony was based on information that he had reviewed from lawsuits or investigation reports involving those incidents, including police reports, police photographs, and witness depositions. In some of the cases, Wallingford actually had visited the accident scene or had examined the vehicle involved in the accident. After analysis, Wallingford concluded that approximately 20 of the 35 rollover accidents reviewed were "substantially similar" to plaintiff's accident.[9]

In response to Toyota's objection that the "other similar incidents" evidence was cumulative, and in the interest of time, the court restricted Wallingford's testimony to 15 incidents. Toyota also objected that the factual information underlying Wallingford's opinions was inadmissible hearsay. The court overruled that objection and permitted Wallingford to give a brief summary of each accident for the jury and then to offer his opinion whether each accident was "substantially similar" to plaintiff's accident based on the criteria that he had identified.

On cross-examination, Toyota sought to impeach Wallingford's opinion testimony by referring to information contained in several police reports that were part of the factual information on which Wallingford had based his opinions. According to Toyota, those reports had included accident descriptions that directly contradicted Wallingford's

---

[9] Wallingford based that conclusion on the following criteria: (1) the accidents had occurred on a flat, hard, dry surface; (2) the accidents were the result of tire friction forces alone, *i.e.*, there was no other tripping mechanism or impact before rollover; (3) there was no evidence of driver impairment; and (4) the 4Runner models compared (that is, models from the mid-1980s through 1994) all had substantially the same capabilities as the 1994 model that Sanders had been driving.

conclusions about the substantial similarity of the other accidents to plaintiff's accident. When Toyota offered those police reports into evidence, plaintiff's counsel objected to their admission on the basis that the reports contained inadmissible hearsay. Defense counsel responded:

"It's true that the offering attorney may be prevented from putting things into evidence on the grounds that what the expert relied on is hearsay, but that is not true on cross. [O]n cross, the opposite rule applies: If the witness has relied on the information, it is admissible for impeachment purposes, and it's admissible in the record for that purpose."

The trial court initially sustained plaintiff's objection. Thereafter, the trial court changed its mind about the hearsay nature of the reports and admitted them into evidence for impeachment purposes. Plaintiff again objected and argued that their admission was prejudicial to her because other information in Wallingford's file that the court had not admitted, such as deposition testimony, supported Wallingford's conclusions. In response to that objection, Toyota offered and stipulated to the admission of Wallingford's entire file, which included the reports, depositions, and photographs from the 15 accidents. Accordingly, the trial court admitted Wallingford's entire file into evidence.

On appeal, Toyota argued that the trial court erred when it overruled its hearsay objections and allowed Wallingford's testimony about the factual information contained in his file on which he based his opinions. The Court of Appeals refused to consider the merits of that argument, because it concluded that Toyota had waived any error on that issue when it subsequently offered and stipulated to the admission of Wallingford's file. *McCathern*, 160 Or App at 235-36.

On review, Toyota asserts that the Court of Appeals' refusal to consider that argument was incorrect because it conflicts with this court's holding in *Wallace v. American Life Ins. Co.*, 111 Or 510, 533-37, 225 P 192, *on reh'g* 227 P 465 (1924). Toyota argues that the evidence was inadmissible: (1) because it was hearsay; and (2) because it was unfairly prejudicial. For the reasons set out below, we agree that

Toyota did not waive its objection by stipulating to the admission of Wallingford's file.[10] Nonetheless, we do not agree that the testimony was hearsay or that it was unfairly prejudicial.

■ We first consider plaintiff's argument that Toyota waived its hearsay objections to Wallingford's testimony by stipulating to the admission of his file. Toyota is correct that, under *Wallace*, plaintiff's waiver argument fails. The plaintiff in *Wallace* argued that the defendant had waived its objections to the plaintiff's expert's opinion evidence for two reasons: first, because the defendant had "met [the] plaintiff's expert witnesses with expert witnesses and offered 'opinion evidence' against 'opinion evidence,' " 111 Or at 533; and, second, because the defendant had cross-examined the plaintiff's expert about the same evidence that, during the direct examination of that expert, the court had admitted and the plaintiff had used over the defendant's objections, *id.* at 537. The court in *Wallace* disagreed with the plaintiff's waiver arguments, explaining:

> "The defendant did not waive his objection and exception by attempting to disprove the matters testified to, or to prove facts inconsistent with them. A party excepting to the admission of testimony is not bound to concede its truth, or to refrain from combating it, in order to retain his exception."

*Id.* at 536 (internal quotation marks omitted).

■ ■ The rationale articulated in *Wallace* is consistent with the general understanding that, when a party's objection is made and overruled, that party

> "is entitled to treat [that] ruling as the 'law of the trial' and to explain or rebut, if he can, the evidence admitted over his protest. Consequently, there is no waiver if he cross-examines the adversary's witness about the matter, even though the cross-examination entails a repetition of the fact, or if he meets the testimony with other evidence which, under the theory of his objection, would be inadmissible."

---

[10] In reaching its decision on that issue, the Court of Appeals relied on two criminal cases, *State ex rel Juv. Dept. v. Cook*, 325 Or 1, 932 P2d 547 (1997), and *State v. Lopez*, 147 Or App 314, 936 P2d 386 (1997). Those cases do not involve the admission of hearsay under OEC 703 and, therefore, are inapposite to our analysis in this case.

Charles Tilford McCormick, *McCormick on Evidence*, § 55, 246-47 (5th ed 1999) (footnotes omitted). That rationale applies equally to this proceeding. A party has the right to meet its opponent's evidence admitted under the trial court's rulings. After making the proper objections, a party may counter its opponent's evidence, whether correctly admitted or not, without waiving its evidentiary objection on appeal. Accordingly, Toyota did not waive its hearsay objection by stipulating to the admission of Wallingford's file. Because no waiver occurred, we turn to Toyota's argument that the admission of Wallingford's testimony about the information underlying his opinion was reversible error.

■ OEC 703 specifies some types of information on which an expert witness may rely for his or her opinion testimony.[11] One source of information provided by OEC 703 is facts or data that are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Although the rule specifically provides that such evidence "need not be admissible," OEC 703 does not render otherwise inadmissible evidence admissible merely because it was the basis for the expert's opinion.

■ Nevertheless, we hold that the trial court did not err when it overruled Toyota's hearsay objections, because plaintiff offered the evidence of the details surrounding the 15 other rollover accidents only to provide the foundation necessary to explain Wallingford's opinions, not for its truth. The trial court admitted the evidence solely for that purpose. Consequently, by definition, that information was not "hearsay." *See* OEC 801(3) ("hearsay" is out-of-court statement offered to prove truth of matter asserted); *see also Oberg v. Honda Motor Co.*, 316 Or 263, 269-70, 851 P2d 1084 (1993) (excerpts of documents read to jury admitted for limited purpose that defendants had notice of defective design and not for truth were not hearsay), *rev'd on other grounds sub nom Honda*

---

[11] OEC 703 provides:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

*Motor Co. v. Oberg,* 512 US 415, 114 S Ct 2331, 129 L Ed 2d 336 (1994).

■　　Toyota also contends that evidence of other similar incidents, including Wallingford's testimony,[12] even if otherwise admissible, was unfairly prejudicial under OEC 403[13] and, therefore, should not have been admitted. In support, Toyota argues that the evidence was prejudicial because it "powerfully suggested to the jury that it was the vehicle—not the driver, not the road, not the sudden, hard steering, not the speed, and not the other circumstances—that caused the rollover in this case." In addition, Toyota argues that the evidence was unfairly prejudicial because some of that testimony included information about injuries or deaths that resulted from those accidents.

■■　　We review a trial court's ruling whether to exclude relevant evidence under OEC 403 for abuse of discretion. *State v. Barone,* 329 Or 210, 243, 986 P2d 5 (1999), *cert den* 528 US 1086 (2000). "To be excluded under OEC 403, testimony must be not only prejudicial, but unfairly so." *Id.* at 235. Toyota's assertion that the evidence powerfully suggested that the design of the 1994 4Runner caused the rollover in this case is no more than an assertion that plaintiff's evidence supported her theory of the case. As this court has recognized, relevant evidence often has the effect of proving one party's position while harming the other's. *See Macy v. Blatchford,* 330 Or 444, 455, 8 P3d 204 (2000) (so stating).

The record in this case demonstrates that the trial court complied with OEC 403 by balancing the cost in terms

---

[12] Plaintiff presented two kinds of "other similar incidents" evidence: (1) Wallingford's opinion testimony regarding the substantial similarity of 15 other rollover accidents involving pre-1996 model 4Runners; and (2) videotaped testimony of four witnesses who were involved in four of the 15 accidents and videotaped testimony of one police officer who had investigated one of the 15 accidents.

Toyota has not assigned error to any specific ruling regarding the videotaped testimony. However, Toyota's objection under OEC 403 to the prejudicial nature of "other similar incidents" evidence necessarily includes that testimony.

[13] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

of prejudice of the evidence against its benefits. *Oberg*, 316 Or at 270-71. The court limited both the number of incidents that Wallingford could discuss and the number of videotaped depositions that plaintiff could present. Additionally, the court did not permit plaintiff to submit detailed evidence of the injuries other people had suffered in other rollover accidents. We conclude that the trial court permissibly could have determined that the probative value of the "other similar incidents" evidence was not substantially outweighed by the danger of unfair prejudice. Accordingly, the trial court did not abuse its discretion in admitting that testimony.

■ We turn to the primary issue on review, *viz.*, whether plaintiff introduced sufficient evidence to establish that Toyota's 1994 4Runner was designed defectively. At the outset, we must determine the controlling standard for design defect liability in Oregon and the proof necessary to satisfy that standard.

Before 1979, product liability claims in Oregon were common-law claims. *See Wights v. Staff Jennings*, 241 Or 301, 405 P2d 624 (1965) (recognizing common-law action for personal injuries resulting from defective product). In 1967, this court expressly adopted Section 402A of the *Restatement (Second) of Torts* (1965) (*Restatement*) and its consumer expectations test as the standard for liability in design defect cases. *See Heaton v. Ford Motor Co.*, 248 Or 467, 470, 435 P2d 806 (1967) (adopting Section 402A). *Heaton* explained that, under Section 402A, a product "is dangerously defective when it is in a condition unreasonably dangerous to the user" and that "unreasonable" in that context means "dangerous to an extent beyond that which would be contemplated by the ordinary consumer." *Id.* at 471.

Subsequently, in *Phillips v. Kimwood Machine Co.*, 269 Or 485, 525 P2d 1033 (1974), the court deviated from *Heaton*'s "pure" Section 402A approach and announced what became known as the reasonable manufacturer test. Unlike the consumer expectations test, which asks juries to focus on the expectations of the ordinary consumer about product safety, the reasonable manufacturer test instructs juries to focus on the manufacturer's motives for placing the product

on the market and on the reasonableness, or lack thereof, of that conduct. *Phillips* opined:

> "A dangerously defective article would be one which a reasonable person would not put into the stream of commerce *if he had knowledge of its harmful character*. The test, therefore, is whether the seller would be negligent if he sold the article *knowing of the risk involved*."

269 Or at 492 (emphasis in original). The court in *Phillips* acknowledged that Comment *i* to Section 402A of the *Restatement*, previously endorsed by the court in *Heaton*, examines unreasonable dangerousness from a consumer-oriented, as opposed to a seller-oriented, perspective.[14] *Id.* at 492-93. According to *Phillips*, however, the two standards—consumer expectations and reasonable manufacturer—substantively were indistinguishable, because an ordinary consumer expects what a reasonable manufacturer would market. *Id.* at 493. As the court later explained in *Ewen v. McLean Trucking Co.*, 300 Or 24, 706 P2d 929 (1985):

> "Clearly the court [in *Phillips*] regarded a focus on the 'reasonableness' of marketing the product, knowing of its dangers, not as a departure from the Restatement's Comment *i* but as another way to explain it. In the court's view, it might be an advantage to bring the definition of a dangerously defective product back into the 'familiar terms and thought processes' associated with common law negligence, as indeed this alternative phrasing did[.]"

300 Or at 30-31 (footnote omitted).

The departure in *Phillips* from the consumer expectations test subsequently was challenged in *Allen v. The Heil Company*, 285 Or 109, 589 P2d 1120 (1979). The plaintiff in *Allen* contended that analysis of a design-defect claim necessarily begins with the consumer expectations test of Section 402A of the *Restatement* and disputed this court's departure

[14] Comment *i* to Section 402A of the *Restatement* provides, in part:

"The rule stated in this Section [402A] applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. * * * *The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. * * *"*

(Emphasis added.)

from that approach. *Id.* at 118-20. In response, this court opined that, because no statute codified Section 402A of the *Restatement,* the consumer expectations test was binding "only so long and in such particulars" as the court found appropriate. *Id.* at 119 n 5.

Motivated, at least in part, by this court's indication in *Allen* that the court believed that it could exercise considerable discretion in applying Section 402A, the 1979 Legislature codified the law of strict product liability by enacting ORS 30.920. *See Ewen,* 300 Or at 28 (enactment of ORS 30.920 motivated by desire to "stabilize the rules of [product] liability"); Or Laws 1979, ch 866, § 2. ORS 30.920 provides:

"(1) One who sells or leases any product in a defective condition unreasonably dangerous to the user or consumer or to the property of the user or consumer is subject to liability for physical harm or damage to property caused by that condition, if:

"(a) The seller or lessor is engaged in the business of selling or leasing such a product; and

"(b) The product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold or leased.

"(2) The rule stated in subsection (1) of this section shall apply, even though:

"(a) The seller or lessor has exercised all possible care in the preparation and sale or lease of the product; and

"(b) The user, consumer or injured party has not purchased or leased the product from or entered into any contractual relations with the seller or lessor.

"(3) It is the intent of the Legislative Assembly that the rule stated in subsections (1) and (2) of this section shall be construed in accordance with the Restatement (Second) of Torts sec. 402A, Comments a to m (1965). All references in these comments to sale, sell, selling or seller shall be construed to include lease, leases, leasing and lessor.

"(4) Nothing in this section shall be construed to limit the rights and liabilities of sellers and lessors under principles of common law negligence or under ORS 72.1010 to 72.7250."

In *Ewen*, this court interpreted the legislative mandate in ORS 30.920(3) to construe the substantive formulas codified in subsections (1) and (2) "in accordance with the Restatement (Second) of Torts sec. 402A, Comments a to m (1965)" as an enactment of the consumer expectations test. 300 Or at 27, 31-32. Therefore, the court held that, under ORS 30.920, a jury in a design-defect case "should receive some instruction phrased so as to focus on what extent of risk an ordinary consumer would contemplate when purchasing a product with the knowledge of its characteristics common to the relevant community." *Id.* at 32.

Plaintiff contends that, when the legislature adopted the consumer expectations test in ORS 30.920, it did so to the exclusion of the reasonable manufacturer test. For the reasons set out below, we agree.

It is true that, in *dictum*, this court in *Ewen* stated expressly that it was not resolving the issue whether the reasonable manufacturer test had any continuing relevance in design defect litigation under ORS 30.920. *See Ewen*, 300 Or at 32 (leaving unanswered whether "any role remains for the [reasonable manufacturer] instruction approved in *Phillips*"). However, it is clear from the text of ORS 30.920 that the legislature intended to adopt the consumer expectations test. ORS 30.920(3); *Ewen*, 300 Or at 31-32; *see also PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993) (text of statutory provision is starting point for interpretation and best evidence of legislature's intent). As the court in *Phillips* acknowledged, the reasonable manufacturer and the consumer expectations tests take different perspectives. Whether we agree with the court's conclusion in *Phillips*—that the two tests substantively are equivalent—is of no moment. When it enacted ORS 30.920, thereby codifying the consumer expectations test, the legislature endorsed only one perspective—that of the consumer. We infer from that choice that the legislature did so to the exclusion of the different perspective of the manufacturer. In light of the clear choice embodied in the wording of ORS 30.920, there is no room to argue that the reasonable manufacturer test remains viable. Accordingly, we conclude that the legislature has abrogated the reasonable manufacturer test. Oregon trial

courts no longer may instruct juries according to the reasonable manufacturer test instruction approved in *Phillips*, 269 Or at 501 n 16.

■ Having concluded that, under ORS 30.920, the consumer expectations test governs design defect cases in Oregon, we now consider the proof necessary to establish that a product fails to meet ordinary consumer expectations as to safety.

The Court of Appeals held that there are "two distinct answers" to the question of how a plaintiff proves ordinary consumer expectations in Oregon:

"[A] plaintiff in a defective design case can, with sufficient proof, proceed under either a 'representational' theory, a 'consumer risk-utility' theory, or both."

*McCathern*, 160 Or App at 218. According to that court, a plaintiff may establish consumer expectations under the "representational" theory

"by proving that the manufacturer specifically represented to the consuming public that the product would be able to perform certain functions, when, in fact, it could not, resulting in the plaintiff's injury."

*Id.* at 209. By contrast, the court stated that a plaintiff may establish consumer expectations under the "consumer risk-utility" theory by proving "that a product could have feasibly and practically been designed more safely." *Id.* at 210.

On review, Toyota's first complaint is that the Court of Appeals' decision created, by way of its "representational" theory, a "new theory of product liability" that conflicts with the controlling statute, ORS 30.920, and with this court's case law. Similarly, plaintiff complains that the Court of Appeals' decision erroneously converted categories of evidence that are relevant to consumer expectations into separate theories of liability. We agree with plaintiff's characterization of the error and, for the reasons that follow, we reject the Court of Appeals' conclusion that a product design defect may be proved under two separate and distinct "theories" of liability.

■ As noted above, the consumer expectations test is the only theory of liability that ORS 30.920 expressly mandates. Under ORS 30.920(1), that test requires a plaintiff to prove that the product at issue is both defective and unreasonably dangerous.[15] *See also Restatement* § 402A, Comment *i* (liability under 402A attaches only when defective condition of product makes it unreasonably dangerous to user or consumer). The comments to Section 402A of the *Restatement* define the terms "defective" and "unreasonably dangerous." *See* ORS 30.920(3) (ORS 30.920(1) and (2) "shall be construed in accordance with" *Restatement* Section 402A, Comments *a* to *m*). Both definitions refer to the consumer expectations test as the standard for determining whether a product is defective and unreasonably dangerous.

■ Accordingly, to prove that a product was in a "defective condition unreasonably dangerous to the user or consumer," ORS 30.920(1), the plaintiff must prove that: (1) "at the time it leaves the seller's hands, [the product is] in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him," *see Restatement* § 402A, Comment *g* (so defining "defective"); and (2) "[the product is] dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics," *see Restatement* § 402A, Comment *i* (so defining "unreasonably dangerous"). Whether a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer is a factual question to be determined by the jury. *Heaton,* 248 Or at 472-73. It is the trial court's role, however, to ensure that the evidence is sufficient for the jury to make an informed decision about what ordinary consumers expect. *Id.*

_____

[15] As formulated in ORS 30.920, the necessary elements of a design defect case are: (1) the sale or leasing of a product by one engaged in the business of selling or leasing such products; (2) a product that was expected to, and did, reach the user or consumer without substantial change in condition; (3) a product that, when sold, was in a defective condition unreasonably dangerous to the user or consumer; (4) injury to the user or consumer, or damage to his or her property; (5) that was caused by the product's defective condition. In this proceeding, we are concerned only with the sufficiency of plaintiff's proof under the third and fifth elements listed above—the product's defective condition and causation.

As noted in *Heaton*, in some cases, consumer expectations about how a product should perform under specific conditions will be within the realm of jurors' common experience. *Id.* at 472. However, some design-defect cases involve products or circumstances that are "not so common * * * that the average person would know from personal experience what to expect." *Id.* at 473. When a jury is "unequipped, either by general background or by facts supplied in the record, to decide whether [a product] failed to perform as safely as an ordinary consumer would have expected," this court has recognized that additional evidence about the ordinary consumer's expectations is necessary. *Id.* at 473-74. That additional evidence may consist of evidence that the magnitude of the product's risk outweighs its utility, which often is demonstrated by proving that a safer design alternative was both practicable and feasible. *See id.* at 471 (user has right to expect reasonably safe design).

Plaintiff acknowledges that evidence related to risk-utility balancing of that kind may be necessary to show that a product failed to perform as safely as an ordinary consumer would have expected. However, plaintiff disputes the Court of Appeals' holding that, under the consumer expectations test, a plaintiff *must* introduce such evidence. *See McCathern*, 160 Or App at 211 (proof of safer practicable alternative design essential to consumer risk-utility theory). According to plaintiff, evidence related to risk-utility balancing, as described above, is required only under the now-defunct reasonable manufacturer test. *See Wilson v. Piper Aircraft Corporation*, 282 Or 61, 67-69, 577 P2d 1322 (1978) (relying on *Phillips*'s reasonable manufacturer test; requiring that, when risk-utility balancing and proof of design alternative are necessary, proof must include evidence that alternative design was practicable).

■ We agree that evidence related to risk-utility balancing, which may include proof that a practicable and feasible design alternative was available, will not *always* be necessary to prove that a product's design is defective and unreasonably dangerous, *i.e.*, that the product failed to meet ordinary consumer expectations. However, because the parties did not dispute that evidence related to risk-utility balancing

was necessary in this case, we leave for another day the question under what circumstances ORS 30.920 requires a plaintiff to support a product liability design-defect claim with evidence related to risk-utility balancing of the kind discussed above.

We emphasize that, whether or not evidence related to risk-utility balancing is necessary to satisfy a plaintiff's burden of proof, a plaintiff's *theory* of liability under ORS 30.920 remains the same: That the product was dangerously defective and unreasonably dangerous because it failed to perform as the ordinary consumer expects. In other words, contrary to the Court of Appeals' opinion, "consumer risk-utility" is not a separate "theory of liability" under the statutorily mandated consumer expectations test.

The Court of Appeals' "representational" approach also is not a separate "theory of liability" under the consumer expectations test. Although advertising and promotional materials may be sufficient to demonstrate what the ordinary consumer expects from a product in some cases, such evidence by itself rarely will demonstrate that a product is defective.

In sum, we conclude that the controlling test for design defect in Oregon is the consumer expectations test. ORS 30.920. When a plaintiff alleges that a product is "in a defective condition unreasonably dangerous to the user or consumer," ORS 30.920(1), the plaintiff must prove that, when the product left the defendant's hands, the product was defective and dangerous to an extent beyond that which the ordinary consumer would have expected.

We turn, then, to plaintiff's evidence and whether that evidence was sufficient to support the jury verdict in her favor in this case. This court may set aside plaintiff's verdict only if the court affirmatively can say that there was no evidence from which the jury could have found the facts necessary to establish an element of plaintiff's claim. *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984).

Toyota contends that there was no evidence that ordinary consumers expected the 1994 4Runner to make the "obstacle avoidance maneuvers" that Sanders made in this

case without rolling over. Specifically, Toyota argues that plaintiff failed to produce sufficient evidence that her proposed design alternative, the 1996 4Runner, was practicable, and that her evidence of causation was insufficient. We disagree with both contentions.

As noted, Toyota argued at trial that evidence related to risk-utility balancing was necessary, and plaintiff did not dispute that contention. Accordingly, plaintiff submitted evidence that the magnitude of the 1994 4Runner's risk outweighed its utility and that a safer alternative design was feasible and practicable. Plaintiff's evidence included testimony that the 1994 4Runner had a high risk of rolling over and that the 1996 4Runner was safer and as practicable as the 1994 model without any detriment to other safety or utility features. Plaintiff's accident reconstruction expert, Tamny, testified that it was possible to build a vehicle that would not roll over due to tire friction forces alone, but would skid to a stop instead. Tamny demonstrated that a vehicle's dynamic stability—how much side force the vehicle can withstand in relation to its weight, without rolling—affects its propensity to roll over. According to Tamny, a vehicle with a .90 dynamic stability is reasonably safe. Tamny testified that the 1996 4Runner had a dynamic stability of .94, as compared to the 1994 4Runner, which had a dynamic stability of .80. Toyota achieved that difference by lowering the floor and widening the track width of the 1996 model.

Toyota conceded that what actually was done in 1996 was feasible in 1994. The jury also could have inferred that the 1996 design modifications also were practicable in 1994. Toyota's engineer, Dobashi, testified that the 1996 model design modifications did not interfere with the vehicle's sport utility functions and that they actually improved the handling and stability of the vehicle as compared to the 1994 model. In addition, one witness testified that the design changes actually would have reduced the cost and would not have made the vehicle more dangerous in other respects. It follows from the foregoing that plaintiff presented sufficient evidence from which a jury could have found that the 1996 4Runner design was a safer design that was feasible and practicable when Toyota manufactured the 1994 4Runner.

■ Next, Toyota argues that plaintiff failed to prove that the design of the 1994 4Runner caused her injuries. Specifically, Toyota asserts that plaintiff's proof was insufficient because there was no direct evidence that the 1996 4Runner would not have rolled over under similar circumstances.

Contrary to defendant's assertions, there was sufficient evidence to permit the jury to find that, had plaintiff been riding in a 1996 4Runner on the night of the accident, the 1996 4Runner would not have rolled over. Before trial, Toyota conceded that plaintiff's injuries occurred because the 1994 4Runner in which she was a passenger rolled over. There was evidence from which the jury could have found that the 1996 4Runner, instead of rolling over, would have skidded to a stop. The evidence showed that plaintiff's accident was the result of tire friction forces alone. According to the evidence, Sanders did not apply the brakes before the vehicle rolled, and no other tripping mechanism caused the accident. Toyota's own testing for rollover resistance, in which test drivers made sharp turns on dry, flat, smooth pavement, demonstrated that the 1994 4Runner overturned at 32 miles per hour—approximately 20 miles per hour slower than the speed at which plaintiff's accident occurred. When Toyota tested the 1996 4Runner, using a more extreme test that involved more severe steering maneuvers than those used to test the 1994 model, Toyota was unable to overturn the 1996 model with steering input alone. To make the 1996 4Runner overturn, Toyota's test drivers had to apply the brakes, and the antilock braking system had to be disconnected. In addition, Tamny testified that the difference between the 1994 4Runner and the 1996 model was "clearly significant" because the pre-1996 4Runner will roll on a flat road surface and the 1996 4Runner will not. Tamny testified that the lower center of gravity and wider wheel track of the 1996 4Runner made it "very unlikely" that a 1996 4Runner would have rolled over in the circumstances in which plaintiff was injured.

Based on the foregoing, we conclude that there was sufficient evidence from which the jury could have inferred that the 1996 4Runner would not have rolled over under the conditions of plaintiff's accident. Therefore, contrary to

Toyota's assertions, plaintiff's evidence was sufficient to prove that the design of the 1994 4Runner caused her injuries. *Cf. Baccelleri v. Hyster Co.*, 287 Or 3, 7, 597 P2d 351 (1979) (although no direct testimony that accident would not have happened if forklift had had a backup alarm, evidence from which jury could infer that alarm warning generally was effective in preventing such accidents is sufficient to prove that absence of alarm caused the plaintiff's injuries).

We conclude that the trial court did not err in denying Toyota's motions for directed verdict and JNOV, because plaintiff submitted evidence from which the jury could have concluded that the 1994 4Runner failed to meet ordinary consumer expectations and was, therefore, "in a defective condition unreasonably dangerous to the user or consumer."

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.