No. 420 June 26, 2024 355

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of C. E. W.,
a Person Alleged to have Mental Illness.

STATE OF OREGON,
*Respondent,*

*v.*

C. E. W.,
*Appellant.*

Marion County Circuit Court
22CC06444; A181339

Amy M. Queen, Judge.

Submitted March 20, 2024.

Joseph R. DeBin and Multnomah Defenders, Inc., filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Jon Zunkel-deCoursey, Assistant Attorney General, filed the brief for respondent.

Before Aoyagi, Presiding Judge, Joyce, Judge, and Jacquot, Judge.

AOYAGI, P. J.

Affirmed.

**AOYAGI, P. J.**

In October 2022, appellant was committed to the custody of the Oregon Health Authority (OHA) for up to 180 days, based on his being a person with mental illness, and, in April 2023, his commitment was continued for up to 180 more days.[1] The trial court continued appellant's commitment based on his still being dangerous to others as the result of a mental disorder. Appellant argues that the evidence admitted at the April 2023 hearing was legally insufficient to prove continued dangerousness, while the state maintains that it was legally sufficient.

In making their arguments, the parties take opposing views as to whether the trial court allowed certain testimony by appellant's treating psychiatrist, regarding four incidents documented in appellant's medical records that she did not personally witness, into evidence for its truth. Each party's arguments regarding the sufficiency of the evidence of dangerousness depends on that party's own view of the court's evidentiary ruling. As explained below, we conclude that the trial court understood its evidentiary ruling as allowing it to consider the testimony at issue for its truth, either directly or indirectly, and appellant has not assigned error to that evidentiary ruling. Because we are not in a position to review the evidentiary ruling, and because appellant has not presented any argument that the evidence was legally insufficient even with the psychiatrist's testimony being considered for its truth, we affirm.

## FACTS

Appellant, a 52-year-old man, has schizoaffective disorder of the bipolar type. His symptoms include optical hallucinations, delusional beliefs, and paranoid and disorganized thinking. Those symptoms cause agitation, aggressive behavior, and mood shifts from irritability and agitation to withdrawal and sullenness.

Appellant was committed to OHA custody in October 2022. In April 2023, OHA, following the procedure in ORS 426.301, certified that appellant was still a

---

[1] Appellant's commitment was continued again in October 2023 and April 2024. This appeal pertains solely to the April 2023 recommitment.

person with mental illness and in need of further treatment. Appellant protested continued commitment. The trial court held an evidentiary hearing, as required by ORS 426.307, to determine whether to continue appellant's commitment. The only person who testified at the April 2023 hearing was appellant's attending psychiatrist at the Oregon State Hospital, Dr. Ranganathan. No exhibits were admitted.

Because it is relevant to our disposition, we describe in some detail the procedural circumstances of Ranganathan's testimony regarding four specific incidents of appellant engaging in aggressive, violent, or threatening behavior in the hospital. That testimony was the only admitted evidence of specific instances of dangerous behavior.

The parties disagreed at trial as to whether Ranganathan's testimony regarding conduct by appellant that she did not personally witness was admissible for the truth of the matter asserted. The issue first arose when the state asked Ranganathan to describe specific incidents of appellant engaging in aggressive, violent, or threatening behavior in the hospital. Before Ranganathan answered, appellant's counsel asked in aid of objection whether Ranganathan was "about to testify about things [she] actually witnessed or things that [she] read in a report?" Ranganathan answered that it was mostly things "reported to [her] by nursing staff." Appellant objected to Ranganathan "testifying regarding anything that was told to her by nursing staff as hearsay." The state agreed "as to information that was verbally told to her." The state indicated that it would first ask Ranganathan about events that she personally observed and then go from there.

The state asked Ranganathan to describe any incidents that she personally observed. Instead of answering, Ranganathan commented on the reliability of nurse-reported information. The court struck that comment as non-responsive but, before the state resumed questioning, asked Ranganathan whether information from nursing staff was something that she "include[s] in any assessment and then final determination as to a conclusion" and whether receiving such information from nursing staff was "the normal course of [her] treatment and practice of patients at the

Oregon State Hospital." Ranganathan answered both questions affirmatively.

At that point, no objection was pending, but the court stated on the record:

"Okay. So [appellant's counsel], just so we're clear. I'm going to allow her to talk about—if there's a connection made in a question to the conclusion, her to reference, I think it's relevant for her to distinguish between things that she was just told, which is maybe what was documented.

"For purposes of the weight that the Court, if any, would give her final conclusion. But I do think she's allowed to talk about the information gathered from trained staff, especially since she's testified it would be in the normal course of her treatment and practice."

Appellant's counsel stated that she "would tend to agree" on that point and asked only that it be made "explicit for the record so we can distinguish what is able to be taken for the truth of the matter asserted and what was just supporting her observations on the diagnosis." The court agreed ("Absolutely. Totally agree[.]") and instructed Ranganathan to distinguish when testifying regarding appellant's conduct whether she observed the conduct herself, it was verbally told to her, or it was documented in a report.

Ranganathan began testifying about specific incidents. She testified about an incident on March 10, then began testifying about an incident on March 17 (both of which are described later). In both cases, Ranganathan was not present for the actual incident but saw appellant afterwards while he was in seclusion. Appellant's counsel asked, "[T]his is from review of records that you're testifying about?" Ranganathan answered, "Review of records for the initial incident. But I do have those [interactions] with him in the course of time that he was in seclusion."

After hearing Ranganathan's answer, appellant's counsel stated, "Okay. Just wanted to make a record that the testimony regarding the incident itself is not for the truth of the matter asserted." The state voiced disagreement, asserting that the testimony was "actually admissible" under ORS 426.307(5), regarding medical records in recommitment

hearings, and OEC 803(8), the hearsay exception for business records. Appellant's counsel responded that evidence admissible under ORS 426.307(5) is still subject to hearsay objections and that OEC 803(8) was problematic, even if Ranganathan was a custodian of the medical records, both because the medical records themselves were not in evidence and because appellant should not be deprived of the ability to cross-examine the initial declarant.

After hearing those arguments, the court explained as follows its position on Ranganathan's testimony regarding incidents that she did not personally observe but that were documented in appellant's medical records:

> "THE COURT:   So my understanding of where we are right now is the doctor is merely testifying about the basis for which I'm assuming we're going to get to a final conclusion that she has as his treating physician from the time he entered the State Hospital up until today.

> "With regards to the specific reference of [ORS] 426.307(5), I think what that says is very on point with regards to she's allowed to testify about and talk about records. No records have been put before the court as an exhibit. She's merely testifying about the things she's relying upon for purposes of for her evaluation and then ultimate conclusion that she's going to be asked to give here soon.

> "What I heard [appellant's counsel] saying is with regards to the specific incident that was just addressed, it was the parsing out that I said can happen, which is okay, who said that. Where'd you get that from? And I think [appellant's counsel's] intention was when she said, 'That's just not for the truth of the matter asserted,' is it's not for this Court to decide whether or not it actually happened.

> "It's where did you get that information from. And then what did you do with it? So I think it's more just again a weight. I'm not looking at it as an admissibility issue. I've already said she can talk about it, which I think falls squarely within [ORS] 426.307. And you're correct, [appellant's counsel].

> "We're not talking about a record. But I also don't think that it's touching upon any right to cross-examine because as you appropriately said, it's not being represented to this

Court as a piece of evidence that it happened. Unless I'm misunderstanding your use of it, [state's counsel]—

"[APPELLANT'S COUNSEL]: My understanding of [the state's] argument was that he is in fact trying to have it presented to the Court for the truth of the matter asserted. And my argument is that yes, you could testify about these records. You can testify about this as long as it's understood that it's still hearsay.

"And therefore, cannot be used for the truth of the matter asserted but rather to establish Dr. Ranganathan's treatment, diagnosis, et cetera.

"THE COURT:   I think she's allowed to talk about it. And then at the end I get to rely on all of it and make a decision as to the weight of its validity for the purposes of her conclusion. If you have concerns about that, [appellant's counsel], as far as whether or not that happened or not, then I guess you can ask for a continuance or some— you know, who's the person you want to see the record, to maybe have them available.

"But [I'm] just really looking at it as she's going to give us all the stuff. We're going to parse out where she got it from. And I guess if you have further objections at that point you can—you can do that but I do think you've made—

"[APPELLANT'S COUNSEL]:   I believe I understand, Your Honor.

"THE COURT:   I definitely think you've made your record clear and—

"[APPELLANT'S COUNSEL]:   Thank you.

"THE COURT:   —under [ORS] 426.307(5) in particular she's absolutely allowed to talk about it."

Ranganathan resumed her testimony. Ultimately, Ranganathan testified to four specific incidents documented in appellant's medical records:

- On December 13, 2022, in the middle of the night, appellant accused a staff member of stealing his bike, swung a closed fist at the staff member's head, and said that he was going to kill the staff member and his family. Ranganathan did not witness the incident, but it was documented in appellant's medical records.

- On February 6, 2023, appellant tried to strike another patient. Ranganathan did not witness the incident, but it was documented in appellant's medical records.

- On March 10, 2023, appellant postured aggressively at a female staff member, who he delusionally believed was someone else and trying to harm him. It had happened a few times and appellant could not be redirected, so appellant was placed in four-point restraints ("the last resort" with an aggressive patient) and secluded. Ranganathan did not witness the incident, but it was documented in appellant's medical records. Immediately after the incident, Ranganathan spoke to appellant. He was extremely agitated, would not respond to Ranganathan's questions, and told Ranganathan (while restrained) that he would break her neck if she did not get away from him.

- On March 17, 2023, appellant assaulted another patient in the shower, after the other patient used a racial slur, and appellant was secluded for five to six days. Ranganathan did not witness the incident, but it was documented in appellant's medical records. While appellant was in seclusion, Ranganathan observed that he was agitated and "responding loudly to unseen others." He demanded to be moved off the unit, continued to harbor feelings of wanting to hurt the other patient, and said that "if he were to be released back into the milieu, he would engage in physical aggression again."

In closing argument, the state relied on Ranganathan's testimony regarding the foregoing incidents for the truth of the matter asserted, arguing, "On several occasions [appellant] has actually acted out, striking at peers and threatening staff on multiple occasions. And [Ranganathan] has testified that those behaviors, the primary driver is the paranoia that [appellant] is experiencing." Appellant maintained in his closing argument that Ranganathan's testimony about incidents that she did not personally witness should not be used as "primary evidence that [appellant] is dangerous to other people" but only as going to Ranganathan's "diagnosis, *** her opinion regarding whether or not [appellant's] commitment should be continued."

After hearing the evidence and arguments, the court ordered that appellant's commitment be continued. It found that appellant was still dangerous to others as a result of a mental disorder and in need of further treatment. *See* ORS 426.307(6) (allowing the court to continue the commitment for an additional indefinite period up to 180 days if it determines after a hearing that the person "is still a person with mental illness and is in need of further treatment"). The court cited evidence of "acts of physical aggression towards staff and peers and then specifically towards the doctor" in concluding that appellant remained dangerous to others.

## STANDARD OF REVIEW

When an appellant challenges the legal sufficiency of the evidence for a civil commitment, we are "bound by the trial court's findings of historical fact that are supported by any evidence in the record," and we "review the court's dispositional conclusions, predicated on those findings, for errors of law."[2] *State v. B. B.*, 240 Or App 75, 77, 245 P3d 697 (2010).

## ANALYSIS

On appeal of the order of continued commitment, appellant assigns error to the trial court's mental-illness determination. Appellant does not contest the finding that he has a mental disorder, but he argues that the evidence admitted at his recommitment hearing was legally insufficient to prove a resulting danger to others. *See* ORS 426.130 (allowing the court to commit a "person with mental illness" to OHA for treatment); ORS 426.005(1)(f)(A) (defining "[p]erson with mental illness" to include "a person who, because of a mental disorder, is *** [d]angerous to self or others"); ORS 426.307(6) (allowing continuation of commitment if the person "is still a person with mental illness and is in need of further treatment").

In making that argument, appellant takes the position that the trial court did not receive for its truth Ranganathan's testimony regarding conduct that

_____

[2] Appellant has not requested, and we do not provide, *de novo* review. *See* ORS 19.415(3)(b) (allowing discretionary *de novo* review in equitable proceedings); ORAP 5.40(8)(c) (limiting our exercise of discretion to "exceptional cases").

Ranganathan did not personally witness. Appellant addresses the issue only in a footnote in his opening brief, in which he points to the ruling on his initial hearsay objection, *see* ___ Or App at ___ (slip op at 3) (quoting the initial ruling), and "submits on appeal that the testimony regarding the December, February, and March 10th incidents was not received for the truth of the matter asserted, but merely to explain Ranganathan's conclusion on diagnosis and opinion on commitment."[3] Appellant's merits argument depends on our accepting his view of the evidentiary ruling. He implicitly concedes that if the testimony regarding the four incidents was received for its truth, then the record is legally sufficient to prove dangerousness, or at least he has made no argument that it is insufficient with that evidence.

In response, the state disagrees with appellant's reading of the trial court's evidentiary ruling. The state summarily asserts that the trial court rejected appellant's hearsay argument and received all of Ranganathan's testimony regarding the four incidents for the truth of the matter asserted. Mirroring appellant's approach, the state relies on its own view of the evidentiary ruling in making its merits arguments, explaining why the evidence is legally sufficient to prove dangerousness if all of Ranganathan's testimony was admitted for its truth. The state implicitly concedes that the evidence would be legally insufficient without that testimony, or at least it makes no argument that it would be sufficient even without that testimony.

Having reviewed the record, we interpret the trial court's evidentiary ruling somewhat differently from either party. The court's ruling is not entirely clear, largely because the court never directly ruled on admissibility. Although the parties presented the issue as one of admissibility—with appellant objecting to the evidence as inadmissible hearsay, and the state maintaining that it was admissible for its truth under ORS 426.307(5) and OEC 803(8)—the trial

---

[3] The footnote in appellant's brief does not explain his position on the March 17 testimony. To the extent that appellant views the trial court as having ruled differently on the March 17 testimony than the testimony about December 13, February 6, and March 10, we disagree with that view. We understand the trial court to have applied the same evidentiary ruling to all of Ranganathan's testimony regarding incidents that she did not personally witness but that were documented in the medical records.

court stated that it was "not looking at it as an admissibility issue." Instead, the court appears to have allowed the testimony under OEC 703. Neither the parties nor the trial court expressly cited OEC 703, nor has either party mentioned it on appeal, but the content of the court's ruling points strongly to OEC 703.

OEC 703 permits an expert to testify to inadmissible facts or data on which the expert relied in forming an opinion, if they are of a type reasonably relied on by experts in the field:

> "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

"OEC 703 does not render otherwise inadmissible evidence admissible merely because it was the basis for the expert's opinion." *McCathern v. Toyota Motor Corp*, 332 Or 59, 70, 23 P3d 320 (2001). However, the expert may testify regarding inadmissible evidence "to provide the foundation necessary to explain [the expert's] opinions, not for its truth." *Id*.

The trial court's statements as a whole strongly suggest that it was relying on OEC 703 when it ruled that Ranganathan could testify regarding the four incidents documented in the medical records that she did not personally witness. The court's statements regarding ORS 426.307(5) muddy the waters somewhat, because appellant never argued privilege as a basis to exclude Ranganathan's testimony, and because the state cited ORS 426.307(5) in arguing for admissibility.[4] However, as a whole, the court's explanation of its ruling—both initially and as later clarified—is most consistent

---

[4] ORS 426.307(5) makes certain privileges inapplicable to medical records in recommitment hearings:

"The provisions of ORS 40.230 [(OEC 504 regarding psychotherapist-patient privilege)], 40.235 [(OEC 504-1 regarding physician-patient privilege)], 40.240 [(OEC 504-2 regarding nurse-patient privilege)] and 40.250 [(OEC 504-4 regarding regulated social worker-client privilege)] do not apply to the use of medical records from the current period of commitment or to testimony related to such records or period of commitment in connection with hearings under this section. The court may consider as evidence such reports and testimony."

with OEC 703. That is, the court appears to have ruled that, even if (or even though) it was inadmissible hearsay, Ranganathan could testify to factual information contained in the medical records on which she relied to formulate her expert opinion, because it was information of a type reasonably relied on by experts in Ranganathan's field, and then the court would decide how much "weight" to give Ranganathan's expert opinion. As the trial court put it near the end of its ruling: "I think she's allowed to talk about it. And then at the end I get to rely on all of it and make a decision as to the weight of its validity for the purposes of her conclusion."

When the trial court ultimately decided to recommit appellant, it expressly cited appellant's "acts of physical aggression towards staff and peers and then specifically towards the doctor." The court's reasoning for relying on those facts for their truth (other than conduct toward the doctor herself) is unclear. The court may have believed that otherwise inadmissible facts on which Ranganathan relied in forming her expert opinion were admitted for their truth once the court decided to credit the opinion—which would be legally incorrect. *See McCathern*, 332 Or at 70 ("OEC 703 does not render otherwise inadmissible evidence admissible merely because it was the basis for the expert's opinion."). Or the court may have meant only that it was crediting Ranganathan's expert opinion on dangerousness and thus indirectly accepting its factual basis. It is not immediately apparent whether that would be error. "In determining dangerousness to others, a court may consider the opinions of mental health experts, along with evidence of a person's past acts and his or her demeanor at the commitment hearing." *State v. K. L.*, 220 Or App 647, 655, 188 P3d 395 (2008). Because "dangerous" has a "narrow" meaning in the civil commitment context, "the significance of an expert opinion that a person is 'dangerous' may depend upon the extent to which the expert relies on the kinds of threats of harm that are legally sufficient to permit a civil commitment." *State v. S. R. J.*, 281 Or App 741, 749, 757-58, 386 P3d 99 (2016). We are unaware of any existing case law addressing whether a person may be found dangerous for civil commitment purposes based solely on a psychiatric expert's

opinion of dangerousness, founded on inadmissible factual information.[5]

The difficulty for appellant is that the evidentiary issue is not before us for review. Appellant has not assigned error to the trial court's ruling allowing Ranganathan to testify to incidents documented in appellant's medical records that she did not personally witness but relied on in forming her expert opinion. To the extent that the ruling itself was erroneous, it would be inappropriate for us to review an evidentiary ruling to which error has not been assigned and the merits of which neither party has briefed, as a potential predicate to reversing a civil commitment. Alternatively, if the ruling itself was correct but the trial court misunderstood the legal import of that ruling when it came time to evaluate the evidence, that is also an issue that appellant has not raised and on which neither party has provided any briefing.[6]

In the end, appellant's only claim of error is that the evidence was legally insufficient to establish dangerousness, and appellant has built that argument on the premise that the trial court did not receive Ranganathan's testimony regarding incidents that she did not personally witness for its truth. However, as described, the court did consider that testimony for its truth, either directly or indirectly, so the premise is faulty. Under the circumstances, based on the arguments that have been made, we reject appellant's assignment of error and affirm the recommitment order.

Affirmed.

---

[5] Typically, there is admitted evidence of dangerousness beyond an expert's opinion of dangerousness, either in the form of witness testimony or in the form of records admitted for their truth. *See, e.g.*, *S. R. J.*, 281 Or App at 759 (Lagesen, J., dissenting) (noting that the "[a]ppellant's medical records were admitted into evidence without objection, and without limitation as to how the trial court could consider them in making its decision").

[6] We note that this situation differs from one in which a trial court expressly rules to exclude certain evidence from the record but then accidentally refers to it in making its ultimate commitment decision. In that situation, we would consider only the admitted evidence in addressing whether the evidence was legally sufficient to support the commitment. Here, by contrast, the trial court allowed the doctor to testify about incidents documented in appellant's medical records that she did not personally witness, there is some ambiguity as to the intended scope and effect of that ruling, and the trial court ultimately relied on that testimony for its truth—either directly or indirectly—in explaining its commitment decision.