**MR. FURNITURE WAREHOUSE, INC., Mr. Wholesale, Inc., Howard Cassett, Plaintiffs–Appellants,**

v.

**BARCLAYS AMERICAN/COMMERCIAL INC., Stenhouse, James a/k/a, Jim Stenhouse, Defendants–Appellees.**

No. 89–5290.

United States Court of Appeals, Eleventh Circuit.

Dec. 27, 1990.

---

Sheldon Rosenberg, Michael Rothman, North Miami, Fla., for plaintiffs-appellants.

Kenneth B. Robinson, Byron G. Petersen, Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A., Ft. Lauderdale, Fla., for defendants-appellees.

Before HATCHETT and ANDERSON, Circuit Judges, and GODBOLD, Senior Circuit Judge.

ANDERSON, Circuit Judge:

In February of 1986, appellants Mr. Furniture Warehouse, Inc. and Mr. Wholesale, Inc., related companies involved respectively in the retail and wholesale furniture business in south Florida (collectively referred to as "Mr. Furniture"), filed a complaint, as amended, against appellee Barclays American/Commercial, Inc. ("Barclays"). The complaint alleged defamation, violations of Sections 1 and 2 of the Sherman Act, and other torts held to be without merit and dismissed by the district court. Howard Cassett, president of Mr. Furniture, and James Stenhouse, a Barclays employee, were originally parties to the lawsuit but were dismissed as such by the district court. The district court entered summary judgment in favor of Barclays on the antitrust claims on the ground that Mr. Furniture lacked standing. 708 F.Supp. 331 (1988). R10–193. The defamation count resulted in a jury verdict finding for Mr. Furniture but awarding only nominal damages based on a verdict form that excluded the issue of punitive damages from the jury's consideration. After the verdict, the district court directed a verdict for Barclays on the punitive damages issue. R13–253. Mr. Furniture appeals, arguing that the district court erred on the standing issue and that the jury should have been given the opportunity to award punitive damages. We hold that the district court properly denied Mr. Furniture antitrust standing and correctly directed the verdict as to punitive damages.

## I. FACTS

In the furniture industry, purchasers of furniture like Mr. Furniture often buy from manufacturers on credit. Frequently, this credit is extended not by the furniture manufacturer itself, but rather by an institution in the business of commercial factoring. Barclays, as a commercial factor, purchases accounts receivable from furniture manufacturers, usually at a discount, and assumes the collection responsibilities. Where an account is purchased on a non-recourse basis, the factor also assumes the risk of non-payment. In order to minimize this risk, Barclays and other factoring institutions are sensitive to a furniture purchaser's credit rating and other attributes indicating an ability to pay.

It is undisputed that Barclays is a major, perhaps even the dominant, factor in the south Florida market and that Barclays has entered into a series of exclusive factoring arrangements with many of the manufacturers from which Mr. Furniture buys. It is also undisputed that Barclays has refused to extend credit to Mr. Furniture, either because of Barclays' perception of Mr. Furniture's credit worthiness, or, as Mr. Furniture claims, because of personal animosity between James Stenhouse of Barclays and Howard Cassett of Mr. Furniture. Although Mr. Furniture is free to pay cash for furniture or to arrange for credit from other sources, Barclays' refusal to provide credit has precluded Mr. Furniture from purchasing furniture from manufacturers which factor exclusively with Barclays on credit terms favored by Mr. Furniture. The resulting injury to Mr. Furniture's business is the basis for the antitrust counts.

The defamation count arose from a statement made by Linda Strickland, a Barclays employee, to a sales representative for a furniture manufacturer that Mr. Furniture was "raising inventories and credit to go out of business." SR2–9, 13.

## II. DISCUSSION

### A. *Antitrust Standing*

Under Section 4 of the Clayton Act, 15 U.S.C.A. § 15 (Supp.1990), "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue ..." for treble damages. This broad formulation has been judicially circumscribed, *inter alia*, by requiring a plaintiff to demon-

strate what has been termed "antitrust standing." *See Associated Gen. Contractors of Cal. v. Cal. St. Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Although the concept of antitrust standing has proved to be somewhat elusive, *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 478, 102 S.Ct. 2540, 2547, 73 L.Ed.2d 149 (1982), the Supreme Court and this court have prescribed general principles to guide the standing analysis.

■ In *Assoc. Contractors,* the Court applied a series of interrelated factors in addressing the issue whether the plaintiff union had standing to bring an antitrust action against contractors who were alleg-' edly exerting pressure on other contractors and subcontractors to hire only non-union labor: (1) intent; (2) the causal connection between the alleged antitrust violation and the injury; (3) the nature of the injury, including whether the injury is of the kind that the antitrust laws were intended to redress; and (4) the directness or indirectness of the injury, including the existence of an identifiable class of persons who are more direct victims, and including the problem of duplicative recovery or complex apportionment of damages.[1]

We will apply these factors to Mr. Furniture's claims under both §§ 1 and 2 of the Sherman Act. The issue of antitrust standing must be tested by reference to the allegations of the complaint. *Amey, Inc. v. Gulf Abstract & Title, Inc.,* 758 F.2d 1486, 1497 (11th Cir.1985), *cert. denied,* 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986); *Construction Aggregate Transport, Inc. v. Florida Rock Ind., Inc.* 710 F.2d 752, 763 (11th Cir.1983).

1. Section 1 of the Sherman Act

Section 1 of the Sherman Act, 15 U.S.C.A. § 1 (Supp.1990) provides, in pertinent part:

> Every contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal....

Mr. Furniture's complaint alleges that Barclays violated § 1 by garnering an increasing percentage of the market for factored credit through its exclusive contracts with furniture manufacturers. Thus, the complaint continues, because Barclays has refused to extend credit to Mr. Furniture, Mr. Furniture is precluded from purchasing furniture with advantageous factored credit from an ever increasing number of furniture manufacturers. To support its argument that this injury is an antitrust injury directly caused by the alleged § 1 violation, Mr. Furniture relies on *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). Thus, we must examine the facts and holding of *McCready* to gauge the strength of Mr. Furniture's argument.[2]

Carol McCready was the recipient of health insurance benefits provided by her employer through Blue Shield of Virginia. Generally, the group health plan reimbursed a portion of the cost of psychotherapy performed by psychiatrists but not if the treatment was provided by psychologists. After McCready received such treatment from a psychologist, she submitted a claim to Blue Shield which was denied. McCready then filed a class action on behalf of psychotherapy patients who had similarly been denied reimbursement seek-

---

1. This circuit has traditionally applied a "target area" test that embraces substantially the same factors. In *Amey, Inc. v. Gulf Abstract & Title, Inc.,* 758 F.2d 1486, 1496 (11th Cir.1985), *cert. denied,* 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986), we held that our "target area" test does not produce materially different results from application of the *Associated Contractors* guidelines. Under either test, the key factors are "the physical and economic nexus between the alleged violation and the harm to the plaintiff, and ... the relationship of the injury alleged with those forms of injury about which

Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4." *McCready,* 457 U.S. at 478, 102 S.Ct. at 2547–48; *Amey,* 758 F.2d at 1496–97.

2. For purposes of this standing analysis and to separate the standing issue from the merits of the antitrust claims, we will assume that a violation of § 1 of the Sherman Act has in fact occurred.

ing treble damages under § 4 of the Clayton Act. McCready alleged that she and others had been injured as a result of a conspiracy between Blue Shield and a Virginia psychiatry association designed to exclude psychologists in violation of § 1 of the Sherman Act.

The Supreme Court held that McCready had antitrust standing because she was injured as a direct result of the anticompetitive scheme. Denying reimbursement to patients who were treated by psychologists was necessary to accomplish the desired result—the exclusion of psychologists—because beneficiaries of the Blue Shield plan would be forced either to go to psychiatrists or to forego reimbursement. Thus, the Court concluded that McCready's injury was "inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." McCready, 457 U.S. at 484, 102 S.Ct. at 2551.

■ Mr. Furniture argues that although the primary victims of Barclays' activities are other factoring institutions, it is in a position analogous to McCready. A closer examination of the facts of the instant case, however, reveals that Mr. Furniture's injury is far more remote than was McCready's. Assuming, arguendo, but expressly not deciding, that Barclays' exclusive contracts with manufacturers are in violation of § 1 and have an anticompetitive effect in the factored credit market, Mr. Furniture's injury does not flow therefrom. Unlike McCready, the denial of credit to Mr. Furniture is not a necessary component of the alleged anticompetitive purpose of Barclays to exclude competing factors. If Barclays' activities are in violation of § 1, the violation is not furthered in the least by refusing to extend credit to Mr. Furniture. In fact, there is no suggestion that the denial of credit to Mr. Furniture had any relationship at all to Barclays' alleged anticompetitive purpose of excluding competing factors. Thus, the injury suffered by Mr. Furniture was not the kind

of injury "about which Congress was likely to have been concerned." McCready, 457 U.S. at 478, 102 S.Ct. at 2548. The Supreme Court in McCready acknowledged the importance of this factor, but found that the injury suffered there "was of a type that Congress sought to redress." 457 U.S. at 483, 102 S.Ct. at 2550. Blue Shield's anticompetitive scheme directly depended on refusing to reimburse recipients of psychological services, and McCready's injury was inextricably intertwined with the injury which the conspirators sought to inflict on psychologists. We conclude that the instant case is unlike McCready. Mr. Furniture's injury was not caused by the alleged anticompetitive conduct directed against the other factors, did not further that activity, and in fact had no relation to it. Thus, the nexus between the assumed § 1 violation and Mr. Furniture's injury is insufficient to confer standing in this case.

The foregoing discussion establishes that two of the Associated General factors (i.e., the causal connection between the alleged antitrust violation, and the nature of the injury including in particular whether the injury is of the kind that was of concern to Congress) point to a lack of standing.[3] In addition, it is clear that Barclays' anticompetitive intent was directed at the competing factors, and not at Mr. Furniture. Finally, the presence of more direct victims, i.e., the other commercial factors, also supports our conclusion that Mr. Furniture has no standing to assert a § 1 claim.

An examination of the real cause of Mr. Furniture's injury reveals that any possibility of standing would have to based on § 2 of the Sherman Act. This is because the complaint essentially alleges a unilateral refusal to deal by a monopoly rather than a concerted action refusing to deal. See National Indep. Theatre Exhib., Inc. v. Charter Fin. Group, Inc., 747 F.2d 1396, 1402 (11th Cir.1984) (Section 1 of the Sherman Act does not proscribe independent action refusing to deal), cert. denied sub nom., Patterson v. Charter Fin. Group, Inc.,

---

**3.** We need not decide whether those two factors are dispositive, since other Associated General factors also indicate a lack of standing.

471 U.S. 1056, 105 S.Ct. 2120, 85 L.Ed.2d 484 (1985).

### 2. Section 2 of the Sherman Act

Section 2 of the Sherman Act, 15 U.S. C.A. § 2 (Supp.1990) provides, in pertinent part:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony....

Mr. Furniture's complaint essentially alleges that Barclays' monopoly position in the market for factored credit coupled with Barclays' refusal to deal constitutes a violation of § 2. For purposes of this standing analysis, we will assume, but expressly not decide, that Barclays does indeed have such a monopoly position. It is undisputed that Barclays has refused to deal with Mr. Furniture.

■ The record reveals that Barclays' actions are the product of unilateral decision making, motivated by animosity or bad credit or both. "A unilateral refusal to deal is [generally] not unlawful." *Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 860 (5th Cir.), *cert. denied*, 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113 (1981).[4] Under certain circumstances, however, even a unilateral refusal to deal may constitute a violation of § 2. The proscription on monopolization and attempts to monopolize may embrace a unilateral refusal to deal "when accompanied by the intent to monopolize and the requisite degree of market power...." *National Indep. Theatre Exhib.*, 747 F.2d at 1402 (citing *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377–78, 93 S.Ct. 1022, 1029–30, 35 L.Ed.2d 359 (1973)). *See also California Steel & Tube v. Kaiser Steel Corp.*, 650 F.2d 1001, 1003–04 (9th Cir.1981) (citing *Times–Picay-*

*une v. United States*, 345 U.S. 594, 625, 73 S.Ct. 872, 889, 97 L.Ed. 1277 (1953)). It is clear that monopolistic or other anticompetitive intent is the key factor in determining whether a violation of § 2 has occurred. *See Mid–Texas Communications Systems, Inc. v. American Tel. & Tel. Co.*, 615 F.2d 1372, 1388 (5th Cir.), *cert. denied sub nom., Woodlands Tel. Corp. v. Southwestern Bell Tel. Co.*, 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980); *Poster Exchange, Inc. v. National Screen Service Corp.*, 431 F.2d 334 (5th Cir.1970), *cert. denied*, 401 U.S. 912, 91 S.Ct. 880, 27 L.Ed.2d 811 (1971).

■ In *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919), the Court stated:

> In the absence of any purpose to create or maintain a monopoly, the [Sherman] act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal....

This principle is also embraced in the notion that to constitute a violation the monopolist's activities must tend to cause harm to competition; unrelated harm to an individual competitor or consumer is not sufficient. *UNR Industries, Inc. v. Continental Ins. Co.*, 623 F.Supp. 1319, 1328 (N.D.Ill.1985). For example, in *Construction Aggregate Transport, Inc. v. Florida Rock Ind., Inc.*, 710 F.2d 752 (11th Cir. 1983), we found antitrust standing on behalf of the victim of a refusal to deal that was designed to have an anticompetitive effect on the relevant market.

■ A monopolist's refusal to deal becomes actionable under the antitrust laws only where the refusal is designed to have an anticompetitive effect, whether to gain greater market share, to drive up prices, or to obtain some other illegal goal.[5] *See Mid–Texas Communications*, 615 F.2d at

---

**4.** This case was decided prior to the close of business on September 30, 1981, and is binding precedent in this circuit under *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981).

**5.** Even where there is concerted action refusing to deal, an anticompetitive purpose or effect

would still be a necessary element of a Sherman Act violation. *See Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 860–61 (5th Cir.), *cert. denied*, 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113 (1981) (quoting *Aladdin Oil Co. v. Texaco, Inc.*, 603 F.2d 1107, 1115 (5th Cir.1979)).

1385–86. Limiting § 2 to these situations effectuates the legislative purpose behind the act, which is "to assure ... the benefits of price competition," not to serve as a "balm for all wrongdoing in the business community." *Associated Gen. Contractors of California v. Cal. St. Council of Carpenters*, 459 U.S. 519, 538, 103 S.Ct. 897, 908, 74 L.Ed.2d 723 (1983); *Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739, 751 (9th Cir.1984) (Kennedy, J., dissenting), *cert. dismissed*, 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985).

■ In the instant case, appellant does not allege nor do we construe Barclays' refusal to extend credit to be an attempt to garner more market share or to accomplish any other anticompetitive end. "It requires a long stretch to call an individual refusal to deal 'monopolizing' when it does nothing to increase the refuser's monopoly power and nothing to increase his position in any market." P. Areeda, *Antitrust Law* ¶ 736, at 274 (1978). Although Mr. Furniture may "feel oppressed because [it] lacks the alternative sources [of factored credit with certain furniture manufacturers] that competition would provide if it existed," *id.*, ¶ 736, at 271, this is not an injury cognizable under the antitrust laws in the absence of a purpose to affect, or an effect in, the relevant markets. In other words, Mr. Furniture's injury is not of the kind that the antitrust laws were intended to forestall.[6] It is also clear that Mr. Furniture was not the object of any anticompetitive intent.

For the foregoing reasons, we conclude that Mr. Furniture has no standing to assert a claim under § 2 of the Sherman Act.

## B. *The Punitive Damages Issue*

Appellant Mr. Furniture alleges that the district court committed error with regard to the punitive damages issue in two respects. First, Mr. Furniture claims that the verdict form submitted to the jury was flawed because it did not allow the jury to consider an award of punitive damages. Second, appellant urges us to reverse the district court's directed verdict on this issue, which was entered after the jury returned with a verdict finding defamation *per se* but awarding only nominal damages. It is clear to us, however, that these two grounds for appeal merge into the determination of the propriety of the directed verdict.[7]

The district court based its directed verdict on *Mercury Motors Exp., Inc. v. Smith*, 393 So.2d 545 (Fla.1981). In *Mercury Motors*, the Florida Supreme Court enunciated the following principles of law:

(1) An employer is vicariously liable for *compensatory* damages resulting from the negligent acts of employees committed within the scope of their employment even if the employer is without fault. This is based upon the long-recognized public policy that victims injured by the negligence of employees acting within the scope of their employment should be compensated even though it means placing vicarious liability on an innocent employer. (2) Punitive damages, however, go beyond the actual damages suffered

**6.** As the discussion in the text implies, this lack of an antitrust injury also indicates that Barclays has not violated § 2 at all. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (failure to prove antitrust injury prevents recovery of damages). That failure, however, is also indicative of a lack of standing. In *Associated Contractors*, 459 U.S. at 538–39, 103 S.Ct. at 908–09, the Supreme Court cited *Brunswick* for the proposition that, as part of an antitrust standing analysis, "the alleged injury must be analyzed to determine whether it is of the type that the antitrust statute was intended to forestall." The fact that Mr. Furniture's lack of an antitrust injury demonstrates the absence of an antitrust violation renders problematic the application of

some of the *Associated General* guidelines for determining standing. For example, it is difficult to examine the causal connection between the antitrust violation and the injury (as well as the directness of the injury) where there is no antitrust violation. Suffice it to say, however, that Mr. Furniture has failed to demonstrate that its injury was caused by Barclays' violation of § 2. Moreover, we do not interpret *Associated Contractors* to require that all of its guidelines be met.

**7.** We find no merit in Mr. Furniture's contention that the district court's failure to permit deliberation on punitive damages may have affected the jury's calculation of general damages.

by an injured party and are imposed only as a punishment of the defendant and as a deterrent to others. (3) Before an employer may be held vicariously liable for punitive damages under the doctrine of respondeat superior, there must be some fault on his part. (4) Although the misconduct of the employee, upon which the vicarious liability of the employer for punitive damages is based, must be willful and wanton, it is not necessary that the fault of the employer, independent of his employee's conduct, also be willful and wanton. It is sufficient that the plaintiff allege and prove some fault on the part of the employer which foreseeably contributed to the plaintiff's injury to make him vicariously liable for punitive damages.

*Id.* at 549 (emphasis in original).

■ In the instant case, Mr. Furniture claims that the requirements of *Mercury Motors* are satisfied because it presented sufficient evidence that Linda Strickland's defamatory statement was either known to or directed by James Stenhouse, Strickland's superior in the corporate hierarchy at Barclays. In order to prevail on this claim, Mr. Furniture must show not only fault on the part of Stenhouse, but also that Stenhouse was of sufficient stature at Barclays to attribute his fault to Barclays. This latter requirement is derived from *Bankers Multiple Line Ins. Co. v. Farish*, 464 So.2d 530, 533 (Fla.1985), where the court held that fault for purposes of imposition of punitive damages on a corporation must be fault on the part of a managing agent or primary owner of the corporation.

■ We will reverse the directed verdict only if we find that "there is substantial evidence, evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, opposed to the motion for directed verdict." *Worsham v. A.H. Robins Co.*, 734 F.2d 676, 681 (11th Cir.1984). Therefore, we will affirm the district court unless Mr. Furniture's evidence is substantial on two issues: (1) that Stenhouse was a managing agent or primary owner of Barclays; and (2) that

Strickland's defamatory statement is traceable to Stenhouse. Our review of the record in light of Florida precedent convinces us that Mr. Furniture has failed to meet this burden of proof with respect to both issues.

James Stenhouse is a unit manager in Barclays' furniture credit department and an assistant vice president at Barclays. R14–14 to 16. Stenhouse is one of approximately twenty assistant vice presidents and is subordinate to thirty vice presidents and senior vice presidents. Although Stenhouse is the director of furniture credit at one of Barclays' offices, Charlotte, he has no responsibility for approving factored credit for other industries for which Barclays is a factor. R14–56, 57. In addition, Stenhouse does not participate in the formation of company policy. R14–17. Of course, there is no contention that Stenhouse is an owner of Barclays. An examination of Stenhouse's position in light of Florida precedent persuades us that he is not a managing agent.

In *P.V. Constr. Corp. v. Atlas Pools of Palm Beaches, Inc.*, 510 So.2d 318 (Fla. Dist.Ct.App.1987), the court imposed punitive damages liability on a corporation for the intentional tort of its *president and chief operating officer.* Stenhouse's position clearly does not have that stature. We find that Stenhouse is more like the director of the Eastern Air Lines' news bureau in *Eastern Air Lines, Inc. v. Gellert,* 438 So.2d 923 (Fla.Dist.Ct.App.1983), where the court refused to impose corporate punitive damages liability for the director's defamatory remarks. *See also Pier 66 Co. v. Poulos,* 542 So.2d 377 (Fla.Dist.Ct.App.) (no corporate punitive damages on defamation claim because hotel president was not a managing agent), *review denied,* 551 So.2d 462 (Fla.1989).

Because we hold that Stenhouse is not a managing agent, we conclude that the verdict on the punitive damages issue was properly directed by the district court. However, even if we were to assume that Stenhouse is a managing agent at Barclays, we still would affirm the district court. The only evidence presented by Mr.

Furniture attributing fault to Stenhouse for Strickland's defamatory comment was that there may be a history of personal animosity between Stenhouse and Howard Cassett, Mr. Furniture's president.[8] This evidence is insufficient to draw a reasonable inference of fault on the part of Stenhouse which foreseeably contributed to the alleged defamatory comment.

AFFIRMED.

---

**8.** Mr. Furniture's contention that the very fact that Stenhouse was involved with the Mr. Furniture account raises an inference that he also knew or approved of Strickland's statement is unsupported by the record. Testimony adduced at trial does indicate that Stenhouse knew about Mr. Furniture's credit difficulties despite the fact that Strickland had authority to approve credit for Mr. Furniture without consulting Stenhouse. However, the testimony also shows that Stenhouse did not learn of Mr. Furniture's problem until August or September of 1986, R15–149, some months after the defamatory statement, which was made in June or July of 1986. SR2–9.