**Ritzy ROMERO, Plaintiff,**

v.

**TOYOTA MOTOR CORPORATION, et al., Defendants.**

**Case No. 10–21699–CV.**

United States District Court, S.D. Florida.

Jan. 7, 2013.

Francisco R. Angones, Angones McClure & Garcia, Raul Carlos De La Heria, Joel Stephen Perwin, Miami, FL, Daniel Louis Koch, Koch, Parafinczuk & Wolf, P.A., Fort Lauderdale, FL, for Plaintiff.

Bard D. Borkon, David W. Graves, Bowman and Brooke, LLP, Minneapolis, MN, Robert John Rudock, Loren William Fender, Whitney Victoria Harrell, Arnstein & Lehr LLP, Miami, FL, for Defendants.

## ORDER

KATHLEEN M. WILLIAMS, District Judge.

**THIS MATTER** is before the Court on several post-verdict motions: Plaintiffs'

Motion for New Trial (DE 173); Plaintiffs' Motion to Alter and Amend Judgment (DE 174); Defendants' Renewed Motion for Directed Verdict (DE 176); Defendants' Motion to Alter Judgment (DE 177); and Plaintiffs' Motion to tax Costs (DE 178). The Court received considerable briefing and heard argument on the motions on September 21, 2012. For the reasons discussed in the Court's analysis below, the Court will grant Defendants' renewed motion for judgment as a matter of law, deny the remaining motions, and enter an amended final judgment.

## I. BACKGROUND

On June 9, 2009, Ritzy Romero—a healthy and pregnant 32 year old—was involved in an automobile accident. The accident, a roll-over, occurred in broad daylight and at a speed of approximately 35 miles-per-hour. Another driver, Osiris Nunez, struck Ms. Romero's automobile, causing only bumper damage to his vehicle, but catastrophic damage to hers after it overturned twice.[1] As a result of this accident, Ms. Romero sustained a spinal injury causing quadriplegia, lost her unborn child, and incurred extensive medical bills. Ms. Romero is now unable to care for her two children or to work for even the modest wages she earned as a housekeeper before the accident. Through this action, she brought suit against Defendants Toyota Motor Corporation and Toyota Motor Sales, U.S.A., Inc. ("Toyota")— the manufacturer of the 1994 "second generation" Four Runner she was operating—

for strict liability, negligence, negligent misrepresentation, and failure to warn.[2] She also brought claims on behalf of her two minor children who, although not in the vehicle at the time, alleged a loss of support and companionship caused by their mother's injuries.

The parties proceeded to trial on January 31, 2012. After two-and-a-half weeks of testimony from numerous fact witnesses including Ms. Romero and her family, Toyota employees involved in the Four Runner's development and sale, as well as design and safety experts, the jury returned a verdict in favor of Plaintiff. It found that the subject Four Runner was defective and unreasonably dangerous, negligently designed, and a legal cause of Ms. Romero's injuries. The jury awarded Plaintiffs $12,254,745.00 in past and future medical and life care expenses. However, the jury did not award any damages for pain and suffering or past and future lost wages; for the loss of parental services; for mental pain and suffering; for loss of parental comfort of her minor children; or for punitive damages. The jury's award was reduced by 80 percent to $2,450,949.00 to account for the actions of Mr. Nunez as a non-party tortfeasor, because the jury determined was at fault for most of Ms. Romero's injuries.

The motions presently before the Court contend that Plaintiffs' suit is time-barred, necessitating judgment in favor of Toyota; that the jury's verdict was a compromise between damages and liability, necessitat-

---

1. Plaintiffs contended that the rollover was not a result of Mr. Nunez striking the side of her vehicle, but from Ms. Romero steering to avoid the collision.

2. Plaintiffs' Second Amended Complaint (DE 19) also alleged defects in the automobile's handling and stability insofar as the vehicle posed rollover risk (Compl. ¶¶ 24(a)-(b), 24(f), 30(a), 30(c)-(d), 30(g)), roof strength with respect to the roof crush the subject vehicle

experienced (Compl. ¶¶ 24(b), 24(e)(f), 30(c)-(d), 30(g)), and the failure of various safety systems such as seat belts, air bags, and brakes (Compl. ¶¶ 24(b), 30(b)). Plaintiffs withdrew their safety claims on the eve of trial. (*See* DE 126.) After Plaintiffs' case-in-chief, the Court directed verdict on Plaintiffs' failure to warn claim. (See DE 171.) Plaintiffs proceeded to trial on claims related to handling and stability and roof design.

ing retrial on liability and damages; that the award failed to take into account any non-economic damages and certain categories of economic damages that were uncontested and supported by unrebutted evidence, necessitating additur or a trial on damages alone; that the award should not have been reduced to account for Mr. Nunez's comparative negligence; that the final judgment entered after the trial failed to account for all claims for relief and should be amended; and that the Plaintiff, as the "prevailing party," should be compensated for her costs in bringing this action. As the Court indicated to the parties at oral argument, however, only the first of these issues is dispositive.

Principally, in their renewed motion for judgment as a matter of law, Defendants contend that Plaintiffs' claims are barred by a statute of repose applicable to products liability actions in Florida. Section 95.031 of the Florida Statutes precludes products liability claims under certain circumstances:

> An action for products liability under s. 95.11(3) must begin within the period prescribed in this chapter, with the period running from the date that the facts giving rise to the cause of action were discovered, or should have been discovered with the exercise of due diligence. . . . *Under no circumstances may a claimant commence an action for products liability . . . if the harm was caused by exposure to or use of the product more than 12 years after delivery of the product to its first purchaser or lessee who was not engaged in the business of selling or leasing the product or of using the product as a component in the manufacture of another product, whichever is later.*

FLA. STAT. § 95.031(2)(b) (emphasis added). The Court previously held that the statute of repose is applicable to this action because: (1) the Four Runner at issue is a product that is not subject to any of the exceptions listed in the statute; (2) Plaintiffs' Four Runner was originally delivered to a purchaser not engaged in the business of selling or leasing the vehicle; and (3) the accident occurred more than twelve years after delivery to the vehicle's first purchaser.

An additional exception exists, however, where the plaintiff can show knowledge of the defect and concealment on the part of the defendant: "[t]he repose period . . . is tolled for any period during which the manufacturer through its officers, directors, partners, or managing agents had actual knowledge that the product was defective in the manner alleged by the claimant and took affirmative steps to conceal the defect." FLA. STAT. § 95.031(2)(d). In order to invoke tolling, the "claim of concealment . . . shall be made with specificity and be based upon substantial factual and legal support." *Id.*

The repose question has been at issue at least since Defendants presented it as an affirmative defense in their answer. (*See* DE 21, ¶ 25.) When Defendants raised it as the sole basis for their summary judgment motion, the Court concluded that there was "marginally sufficient" evidence to allow the issue to proceed to trial on whether the statute was subject to the tolling exception. In particular, Plaintiffs had adduced the following evidence: internal roll-over tests showing that Toyota knew the Four Runner was capable of overturning at 35 miles-per-hour through steering input alone (Engineering Report (DE 64–10)); a jury verdict finding a design defect in the subject Four Runner (*see McCathern v. Toyota Motor Corp.*, 332 Or. 59, 23 P.3d 320 (2001)); and evidence that the model was subsequently redesigned specifically to improve roll-over resistance (which was accomplished, as proven through subsequent testing). (Dobashi Dep. 29:4–30:9 (DE 64–7); Engineer-

ing Report (DE 64–14).) As evidence of concealment, Plaintiffs presented the testimony of an advertising executive who stated that Toyota does not communicate a roll-over propensity to the public because it would be "impossible" for Toyota to do so (Cecconi Dep: 37:2–25 (DE 65–5)); product brochures illustrating vehicular moves that Toyota's representative was unsure the SUV could make without rolling over (*id.* at 34:11–35:24); and a warning label that might not have adequately disclosed the product's potential risks.

A crucial point in the procedural history of this action came when, in their reply in support of their summary judgment motion and at oral argument on their motion, Defendants argued that Plaintiffs' aforementioned repose evidence went only to the issue of the Four Runner's propensity to rollover from abrupt maneuvers. (DE 72, at 3.) Given that the statute of repose required knowledge and concealment "in the manner alleged by the claimant," and that "[a]ny claim of concealment under this section shall be made with specificity" FLA. STAT. § 95.031(2)(d), Toyota asserted that there was insufficient evidence for Plaintiffs to maintain claims related to defects in roof strength based on evidence directed to handling and stability. The Court noted the argument, but declined to consider it as it was a new argument impermissibly raised for the first time in the

reply. *See, e.g., Herring v. Sec'y of Corrs.,* 397 F.3d 1338, 1342 (11th Cir.2005) ("As we have repeatedly admonished, '[a]rguments raised for the first time in a reply brief are not properly before a reviewing court.' " (citation and quotation omitted)). At trial and after Plaintiffs presented their case-in-chief, the Court heard additional argument and denied Defendants' motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). Nevertheless, when it came time to submit the case to the jury, the Court granted Defendants' request to submit a special interrogatory verdict form to the jury (in accordance with Federal Rule of Civil Procedure 49), asking whether Plaintiffs' theories of rollover or roof defects were each subject to the tolling exception.[3] As demonstrated by the verdict form, the jury found that Toyota had not concealed defects with respect to handling and stability[4] but that its "officers, directors, partners had actual knowledge of the defective condition in the design of the 1994 4Runner and took affirmative steps to conceal the defect with respect to ... [t]he 4Runner's roof." (DE 167, at 2.) Thus, the jury concluded that the handling and stability evidence available at summary judgment was insufficient to meet the statute's requirements, but that other evidence presented at trial supported the roof crush claims.[5]

---

**3.** At trial, Plaintiffs objected to any instruction or special interrogatory segregating their claims for handling and stability and roof structure. (Feb. 10, 2012 Tr. 36:22–37–40:4.) Interestingly, arguments made post-trial in other briefing acknowledge the two theories of defect-related liability: (1) a "first-collision" claim in which handling and stability defects caused Ms. Romero's vehicle to overturn; and (2) a "second collision" claim which was based on an alleged roof defect. (DE 194, at 2 (stating that the "Plaintiffs second-collision claim, [ ] was based on the roof defect in the Toyota 4Runner" and that "Plaintiff also asserted 'first collision' claims addressing the cause of the accident").)

**4.** Although the question posed to the jury was couched in terms of the statute of repose, it is unknown whether the jury concluded that there was no defect or that such a defect was not known to Toyota's officers and/or concealed. Plaintiffs do not argue that there was insufficient evidence to support the jury's finding on that issue.

**5.** With respect to roof strength, the Defendants argued to the jury that Ms. Romero's spinal injury was the result of centrifugal force resulting from the vehicle overturning. The jury's finding indicates that it accepted Plaintiffs' view that her injury was caused by her head coming into contact with the roof

Defendants renewed their motion after trial, which is now before the Court. In opposition, Plaintiffs claim that the following evidence supported submitting their roof crush claim to the jury. First, they presented three dynamic "dolly rollover tests" conducted on a prior version of the Four Runner purporting to show severe roof deformation from a simulation of a thirty mile-per-hour flip. (DE 195–1, DE 195–2, DE 195–3.) Despite counsel's characterizations, however, the tests make no particular mention of crush risk to occupants and concluded that there were no problems with the test vehicle. (*Id.*)[6] Motoki Shibata, a Toyota engineer, testified at trial that although Toyota did not conduct such tests above thirty miles-per-hour—which he claimed was "very severe testing" and a "reasonable level" at which to conduct tests—the test results showed an acceptable level of deformation of the roof under those circumstances. (Shibata Tr. 57:12–58:17; 100:4–6.) He also testified that the second and third generation Four Runners met and exceeded federal testing requirements "with margin." (*Id.* at 26:21–27:11.)

Plaintiffs' safety expert, Byron Bloch disagreed—based in part on photographs from those tests—stating that Plaintiffs' vehicle was "defectively designed" and had an "unreasonably dangerous weak roof." (Bloch Tr. 51:13–17; 99:3–105:4.) Nonetheless, he could not testify that Toyota knew that fact and was unsure whether

the tests would have failed federal testing requirements (to contradict Mr. Shibata's testimony). (*See id.* at 111:15–23.) He also testified that at least three other major automobile manufacturers were *not* conducting dolly rollover tests at that time. (*Id.* at 93:18–96:14.) Despite a lack of acknowledgement on the part of Defendants or their witnesses and the absence of any documentation reflecting that Toyota was aware of the particular defect, Plaintiffs conclude that the deformation evidenced in tests designed to measure handling and stability constitutes Toyota's knowledge of a roof deformation defect. Moreover, Plaintiffs assert that Toyota's failure to perform tests at higher speeds—which presumably would have shown greater deformation (*see id.* at 114:15–23)—constitutes concealment.[7]

Second, Plaintiffs introduced evidence of Toyota's subsequent design, focusing on change in one roof component—a beam running above the windshield called the roof header. While Toyota employed a partially open section design for the second generation Four Runner and used reinforcements on the open areas, the third generation model used a completely closed design. (Bloch Tr. 19:13–23; Shibata Tr. 14:3–15–15:24.) Mr. Bloch faulted Toyota for this, testifying that a closed box header has been used by other manufacturers since the 1950s and categorically provides greater roof reinforcement in rollover acci-

---

when it deformed on landing, as presented by their experts.

**6.** The tests were conducted on variations of the 1989 model (e.g., with two and four doors, with four and two-wheel drive, etc.) and their only conclusion is that the dolly rollover tests "do not show any problems of occupant ejection or fuel spillage."

**7.** In particular, Plaintiffs claim that Toyota's aforementioned handling and stability tests, which were conducted at fifty miles-per-hour,

show that Toyota was generally capable of performing vehicle tests at higher speeds. Mr. Bloch also testified that he knew of roof tests by other manufacturers conducted at speeds as high as fifty miles-per-hour. (Bloch Tr. 51:2–12.) While Plaintiffs deduce from these facts that Toyota knew of a defect and was concerned that higher speed tests would have revealed it, they cannot point to any evidence that Toyota understood the tests to show a defect or that the failure to run higher speed tests was intended to further an improper purpose.

dents like the one at issue here. (Bloch Tr. 27:13–28:23.) In testimony played from his deposition, Mr. Shibata explained that Toyota used a completely closed header in the third generation model because of a different arrangement of interior components, which needed to be fitted into fewer holes in the header. (Shibata Dep. 82:17–83:7.) But in the second generation Four Runner, holes were necessary in the center of the header to accommodate those components. (*Id.*) While Mr. Shibata agreed that more holes could make the header weaker, he stated that Toyota provided reinforcement to the open sections (which could otherwise be susceptible to deformation during assembly or vibration during operation) and that a closed section is not categorically stronger than a partially open one properly configured. (*Id.* at 78:7–12; 83:4–7.) Mr. Shibata testified that Toyota did not do testing on just that portion of the roof alone and, accordingly, he was unaware of whether the redesign resulted in an improvement in strength. (Shibata Tr. 63:2–9.) Plaintiffs argue that this evidence shows Toyota's knowledge of alternative, stronger designs available at the time of manufacture of the second generation Four Runner (and presumably, that any roof header not completely closed was known to be so weak that it was defective).

As far as an "intentional and concerted effort" to conceal those defects in design (DE 195, at 6), Plaintiffs contend—as best as the Court can tell—that Toyota misrepresented the reasons for implementing design changes. With respect to the roof header, Mr. Shibata testified that the decision to use a full or partially closed design depended on performance factors that might affect the vehicle. (Shibata Dep. 77:4–78:18.) With respect to another roof component—side rails running perpendicular to the header—Mr. Shibata stated at deposition that Toyota thickened parts of the second generation model (prior to the manufacture of the subject vehicle) to protect against damage caused by vibration. However, Plaintiffs argue that at trial Defendants presented no evidence that vibrations—or noise or other performance issues—were concerns of customers. Thus, they conclude that performance issues were not the actual reasons for the design changes. Further, because Mr. Shibata agreed that the rail design changes had improved roof strength but did not conduct additional tests or roll out a new model, Plaintiffs suggest that the design changes were a pretext for improving roof strength. (*See* Shibata Dep. at 16:22–18:18; *see also* Shibata Tr. 12:20–13:4.) Specifically, Plaintiffs argue that the changes "conceal[ed] weaknesses in the A pillar and the roof header, without drawing enough attention to the defects to require a design change." (DE 195, at 9.) In this manner, Plaintiffs theorize that Toyota knew of roof weakness and hid it from the public.

Third, Plaintiffs claim that Toyota engaged in a systematic scheme to segregate its testing and design engineers and to prevent information from being shared within the company. To support this proposition, they again cite to the testimony of Motoki Shibata, who was involved in the crashworthiness testing of the first, second, and third generation model Four Runners. Mr. Shibata testified that he never spoke with Omasu Dobashi, who was a design engineer responsible for the handling and stability functions of Four Runners, about handling and stability tests. (Shibata Tr: 64:6–13; 67:8–13 ("Q. You never discussed any of handling and stability factors or roof structure with Mr. Dobashi, correct? A. That's Correct.").) Plaintiffs argue that had Mr. Shibata known the results of handling and stability tests (i.e., the vehicle's propensity to roll over), Toyota would have been forced to strengthen the roof. However, Mr. Shiba-

ta testified that the vehicle had "a reasonable level of appropriate roof strength" (Shibata Tr. 27:3–11) and did not posit any connection between roof strength and handling and stability. Similarly, Plaintiffs contend that Toyota engineers were not made aware of the jury verdict in *McCathern*, which dealt with rollover claims. *See McCathern*, 23 P.3d at 332 (finding sufficient evidence regarding handling and stability defects to support jury verdict). Finally, Plaintiffs point to the fact that Mr. Shibata was unaware of the circumstances of Ms. Romero's accident (despite the fact that the company had been sued) as evidence that Toyota avoids learning of information relevant to the safety of its products. (Shibata Tr. 60:5–21.)

Lastly, and to provide a motive for Toyota to conceal defects, Plaintiffs claims that Toyota needed to rush their product to market to capitalize on the sport utility vehicle trend and did not want to subject the model to delays resulting from additional testing and redesign. Plaintiffs read into the record the testimony of Don Cecconi, Toyota's National Sales Manager, about Toyota's investment to quickly saturate the market with first generation Four Runners in 1989.

## II. DISCUSSION

▮▮▮ Federal Rule of Civil Procedure 50 permits courts to grant judgment on a claim or defense where there is not a "legally sufficient evidentiary basis for a reasonable jury to find for the [non-movant] on that issue." Fed.R.Civ.P. 50(a). When a motion for judgment as a matter of law is made after trial pursuant to Rule 50(b), the Court does not consider what the jury actually found, but whether there was a sufficient evidentiary basis for finding for the nonmoving party. *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 723 (11th Cir.2012). In this regard, the Court applies the same standard provided under Federal Rule of Civil Procedure

50(a). The Court "draw[s] all factual inferences and resolve[s] all credibility determinations in favor of the non-moving parties." *Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1344 (11th Cir.2000); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." (citation omitted)). Such a motion should be granted "[i]f the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict." *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989). It should be denied if there is a substantial conflict in the evidence such that "reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions." *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir.2000) ("[T]he non-movant must put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts.").

### A. Actual Knowledge

Preliminarily, the Court agrees with Defendants that there is insufficient evidence of actual knowledge of a defect regarding the roof that can be chargeable to Toyota. The repose statute requires "actual knowledge that the product was defective in the manner alleged by the claimant" and that fact must be known to "the manufacturer through its officers, directors, partners, or managing agents." FLA. STAT. § 95.031(2)(d). *Id.* It further specifies that the factual support a plaintiff must proffer to invoke the exception to the statute must be "substantial." *Id.*

The plain language of the statute and precedent from Florida courts counsel that

knowledge in this situation cannot be established by an act of negligence alone. In *Nehme v. Smithkline Beecham Clinical Laboratories, Incorporated*, 863 So.2d 201 (Fla.2003), the Florida Supreme Court confronted a similar tolling exception applicable to medical malpractice actions, Section 95.11(4)(b) of the Florida Statutes (1993).[8] The plaintiff in *Nehme* had received a pap smear test during a routine gynecological examination, which a single cytotechnologist at a medical testing company interpreted as normal. *Id.* at 203. In actuality, the test proffered signs "as big as a house" that a malignancy was present; evidence later adduced showed that the misinterpretation was "egregious." *Id.* Ultimately, the plaintiffs' condition went undiagnosed and she died. *Id.* Her estate brought suit for wrongful death and medical malpractice after the error was discovered but also after the repose period had expired. *Id.* The court was asked to determine whether concealment implies knowledge or whether it could be satisfied by failing to disclose facts that a reasonably prudent person would have known. Because the court concluded that the legislature sought to require an *intentional* act of concealment preventing discovery, the statute could not be tolled so long as there was no "evidence suggest[ing] that the respondents knew the [ ] slide reading was erroneous," i.e., "the fact of the wrong done to the patient." *Id.* at 205, 207. "The *Nehme* opinion teaches that there can be no concealment within the meaning of the statute without knowledge on the tortfeasor's part of what is being concealed." *Todd v. Johnson*, 965 So.2d 255, 260 (Fla.Dist.Ct.App.2007); *see also Spann v. United States*, No. 11–cv–23178, 2012 WL 3776684, at *5 (S.D.Fla. Aug. 30, 2012) (collecting authority and concluding that the evidence presented failed to "meet the standard for concealment since there is no evidence that Defendant or any agent of Defendant knew about the possibility of injury or inadequate procedures and was knowingly concealing this information to prevent detection").

Only a handful of cases address the statute of repose for products liability claims and the amount of evidence necessary to survive its proscriptions. In a decision addressing how to count the tolling period, Florida's Fifth District Court of Appeals noted that a party should be able to proceed to trial if it can "offer[ ] evidence, which if believed by a jury, could establish, *or at least infer*, concealment of the defect by [the defendant]." *Stimpson v. Ford Motor Co.*, 988 So.2d 1119, 1121 (Fla.Dist. Ct.App.2008) (emphasis added). Without discussing what evidence was in the record or what rendered such evidence sufficient to support a finding that Ford knew that the plaintiffs' 1991 Ford Aerostar van had a defect causing their vehicle to unexpectedly accelerate (and strike a pole), the court reversed the trial court's grant of summary judgment in favor of the defen-

---

**8.** There are differences between the statute at issue in *Nehme* and the one under consideration here, albeit ones that do not change the outcome of the Court's analysis. The *Nehme* court came to its conclusion by applying the doctrine of *noscitur a sociis*, looking to other bases for tolling listed in the statute along with concealment—i.e., "fraud" and "intentional misrepresentation of fact." *Nehme* 863 So.2d at 205. Because those "involve a level of knowledge or intent," it found that the legislative intent behind the concealment prong "was to extend the repose period when *intentional* acts prevent discovery of the injury." *Id.* The alternative bases that assisted that court in its construction do not appear in the statute of repose applicable to products liability actions. Nevertheless Section 95.031(2)(d) specifies that there must be "actual knowledge." FLA. STAT § 95.031(2)(d). Given the legislature's clear pronouncement, there is no doubt that concealment for purposes of Section 95.031(2)(d) requires knowledge.

dant. *Id.* at 1120–21 (concluding, based on evidence presented at summary judgment, that "[t]he Stimpsons should have been given the opportunity to prove concealment by Ford and to demonstrate that their claims were not barred by the statute of repose"). Similarly, in *Avila v. Isuzu Motors Am., LLC,* No. 1:08–cv–23544 (S.D.Fla. Sept. 1, 2009), the court cited the *Stimpson* and *Nehme* standards and allowed the action to proceed based on "numerous photographs, video footage of crash tests, and an internal memorandum from [a competitor]" regarding automobile seats used in its vehicles. Again, like *Stimpson,* the decision did not discuss or elaborate how the evidence referenced amounted to knowledge that the seats had a propensity to collapse during collisions.

On the other hand, in *In re Ford Motor Company Speed Control Deactivation Switch Products Liability Litigation,* 793 F.Supp.2d 1018 (E.D.Mich.2010), the plaintiff presented evidence that an automobile manufacturer knew of overheating issues in speed control deactivation switches used in various other vehicles manufactured by the defendant as demonstrated by product recalls over a long period of time. *Id.* at 1019, 1021. But the plaintiff could not show that those switches were exactly the same as the one installed in a vehicle that caught fire and damaged her property and, thus, could not present substantial evidence to support an inference that the manufacturer knew of the particular defect alleged. *Id.* at 1021–22. Accordingly, summary judgment in favor of the defendant was proper. Similarly, in *Competitor Liaison Bureau, Inc. v. Cessna Aircraft Co.,* No. 6:08–cv–2165, 2011 WL 1344455 (M.D.Fla. Apr. 8, 2011), summary judgment in favor of the manufacturer was

appropriate where the plaintiffs could only show that the industry knew that burning PVC carpet produces dangerous chlorine gas, but not that the manufacturer had knowledge that wires insulated by PVC and installed in its planes would pose the same risk. *Id.* at *7. The court also noted that there was no evidence that the manufacturer "received any reports or complaints related to the toxicity of burning PVC—insulated wiring prior to th[e] lawsuit." *Id.* at *6–7 (distinguishing *Robinson v. Hartzell Propeller, Inc.,* 326 F.Supp.2d 631, 640–41, 649 (E.D.Pa.2004)).

Outside the context of Florida's statute of repose, cases discussing other similar statutes illustrate what can constitute an automobile manufacturer's knowledge. In *Watkins v. Ford Motor Company,* 190 F.3d 1213 (11th Cir.1999), the Eleventh Circuit found that a Georgia statute of repose applicable to products liability actions did not preclude the plaintiff's defective design claim, due to the manufacturer's knowledge of a defect and failure to implement recommended safety alterations.[9] There, the Court based its decision on the company's consideration and rejection of alternative proposals its engineers opined would have made the vehicle more stable (and which were proffered after media criticism of a model that the vehicle was patterned after). *Id.* at 1217. In addition, the plaintiff "presented an array of evidence addressing [the manufacturer's] knowledge of stability problems with [plaintiffs] Bronco II" including tests showing the product tipping at speeds at which similar automobiles remained stable and evidence that the manufacturer's statisticians reported to management that the product had a high roll-over rate compared to a standard vehicle in its class. *Id.* at

---

**9.** The statute in *Watkins* required "conduct which manifests a willful, reckless or wanton disregard for life or property." *Watkins,* 190 F.3d at 1216 (citing GA. CODE ANN § 51–1–

11(c)). Although the statute does not discuss actual knowledge, it was a point considered by the Eleventh Circuit in determining whether the defendant's actions met that standard.

1216–17. And in *Baier v. Ford Motor Company*, No. C04–2039, 2005 WL 928615 (N.D.Iowa Apr. 21, 2005), the court found knowledge of alleged defects in the design and manufacture of a fuel system sufficient to create a genuine dispute of material fact precluding summary judgment.[10] Principally, the manufacturer failed to disclose to the government evidence of an internal crash test involving a very similar vehicle showing that "upon a rear-end collision, the gas tank would rupture and allow fuel to escape into the trunk and passenger compartment of the car." *Id.* at *1, *5. Moreover, the gas tank's susceptibility to rupture during collision was acknowledged in a report from the company's engineering staff (which recommended changing the location of the gas tank) and board minutes discussing how the fuel system compared to one produced by a competitor. *Id.* at *5. While the statutes governing *Watkins* and *Baier* did not require a "substantial" level of proof, those courts nevertheless found the evidence developed sufficient to establish manufacturer knowledge of defects.

■ Against this legal and factual backdrop, the Court finds that no reasonable jury could have found "substantial" evidence of knowledge of a roof defect based on what Plaintiffs have presented here. Similar to the pap smear test in *Nehme*, what Toyota could have discovered or should have understood from the dolly roll-over tests—short of what it actually interpreted them to mean—is not relevant to the issue of Toyota's actual knowledge in a repose context. The ostensible result of the tests is that there were no problems with the vehicle. This is consistent with the testimony of Mr. Shibata who stated that the amount of deformation in the tests was viewed by Toyota to be reasonable and that the vehicle passed federal safety standards. No one at Toyota indicated that the tests put the company on notice of a flaw that could cause injury or subject it to a claim like the one at bar. Plaintiffs' expert could not testify as to what Toyota actually knew and there was no other evidence that Toyota perceived a problem. It is clear that the failure to recognize the implications of these tests (or failing to conduct other types of tests) was a factor in Plaintiffs' safety expert concluding that there was a roof defect and could have been a basis for the jury concluding that the deformation was unreasonable. But Toyota's negligence, even if supported by the record, does not equate to its knowledge of a specific defect.[11]

10. The statute of repose applicable in *Baier* provided an exception for instances where "the manufacturer ... fraudulently conceals information about the product." *Baier*, 2005 WL 928615 at *4 (quoting Iowa Code § 614.1(2A)(a)).

11. Additionally, as with all of Plaintiffs' evidence, it is not apparent that whatever defect the tests showed was known by an officer, director, partner or managing agent, as is required by the statute. *See* FLA. STAT. § 95.031(2)(d). Plaintiffs failed to address the point in opposition to Defendants' motion and summarily contended at oral argument that Toyota's key witnesses—Osamu Dobashi, Takashi Yonekawa, Robert Landis, and Don Cecconi—filled that statutory role. None of those witnesses, however, testified as to any meaningful supervisory or management responsibilities at the company-wide level and Plaintiffs cited no facts or legal authority for their assertion that the role of these witnesses comported with the statute. In *Mr. Furniture Warehouse v. Barclays American/Commercial, Inc.*, 919 F.2d 1517 (11th Cir.1990), *cert. denied*, 502 U.S. 815, 112 S.Ct. 68, 116 L.Ed.2d 43 (1991) the court affirmed a directed verdict for the defendant on a punitive damages issue (relating to defamation)t, which under Florida law would have required "fault on the part of a managing agent or primary owner of the corporation." *Id.* at 1524. Notwithstanding the fact that the plaintiff proved that the employee in question was a unit manager and assistant vice president, he only had responsibility for discrete operations within the company, did not participate in the formation

Next, Plaintiffs attempt to use evidence of a handling and stability defect as evidence of a roof defect. In particular, they contend that because Toyota knew of the Four Runner's propensity to roll over (an issue that the Court left unresolved at summary judgment), it knew that it needed to make the roof better equipped to endure a roof landing. But even if conflating the two theories did not violate the statute's requirement of evidence tailored to the exact nature of the defect asserted, it shows only that Toyota was negligent (inasmuch as it *should have known* to make the roof stronger and erred in failing to do so) rather than that Toyota *actually knew* of a roof defect.

Finally, the fact that Toyota adopted successive redesigns of the roof (going from a partially-open design to a fully-closed one) is facially engaging, but ultimately not sufficiently competent evidence of Toyota's actual knowledge of a defect. For example, Mr. Bloch testified that closed header technology was generally stronger and available at the time of manufacture—indeed, closed header technology has been available to manufacturers since the 1950s. But there is no evidence that in implementing that technology in the third generation model, Toyota sought to correct problems it understood to constitute a defect in the partially open design of the second generation model. Notably, Toyota conducted no tests on the closed box design. Thus, unlike the handling and stability evidence presented on summary judgment, Toyota's representative was unsure how, if at all, the design changes impacted roof strength. Moreover, Toyota did not believe that the partially-

open design accompanied by proper reinforcement was unreasonably weak. And lastly, even Mr. Bloch did not claim that the roof in the third generation header design would have prevented Ms. Romero's injuries or was free from defect.

In sum, there was no substantial factual support for the jury to consider the issue of negligent roof design. In contrast to other situations where manufacturers might have had actual knowledge of a defect, there is no evidence that Toyota received complaints from customers or other reports, or was aware of any news expose or public criticism regarding its products. There was no evidence from litigation to which it was a party and in which a jury concluded that the particular component at issue—the roof—was defective. Similarly, there are no contemporaneous internal discussions acknowledging roof weakness in any of the models produced, no evidence that Toyota considered competitors' designs to be substantially stronger compared to its own, no reports that implementing an even stronger design was necessary or feasible, and no test results conducted by Toyota demonstrating that the roof deformation went beyond acceptable limits. Nor does any other evidence show Toyota's subjective knowledge or give rise to an inference of it. Instead, the evidence shows that according to the data Toyota maintained, the product met and exceeded internal and government tests and was reasonably strong enough to sustain a roof landing. Ultimately, while Plaintiffs may vehemently disagree with Toyota's conclusion and while they might have shown that Toyota *should* have understood more, there was no evi-

---

of company policy, and did not have an ownership stake. *Id.* It was not a situation for instance, where the company's president and chief operating officer was involved. *See id.* (citing *P.V. Constr. Corp. v. Atlas Pools of*

*Palm Beaches, Inc.,* 510 So.2d 318 (Fla.Dist. Ct.App.1987)). Here, there has been no showing that Toyota's witnesses had even the level of responsibility found to be insufficient in *Mr. Furniture Warehouse.*

dence adduced that Toyota had actual knowledge of a roof defect.

## B. Concealment

A second requirement of the statute of repose is that the manufacturer conceal the defect. FLA. STAT. § 95.031(2)(d). It is axiomatic that "[o]ne cannot conceal what one does not know." *Nehme*, 863 So.2d at 207. Accordingly, based on the finding that there was insufficient evidence to show Toyota's knowledge of the defect, there cannot be a claim that the company concealed it from the public. The Court need not address whether reasonable inferences from the Plaintiffs' evidence could give rise to a finding of concealment.

## III. CONCLUSION

The Florida Supreme Court recognized in *Nehme* that statutes of repose can often have the harsh result of extinguishing causes of action even before they accrue— i.e., without regard to the merits of the claim or the claimant's knowledge of a defect. 863 So.2d at 208–09.[12] Indeed, such statutes have barred the claims of a cancer patient who failed to learn of her proper diagnosis because of the defendant's act of negligence, *Nehme*, 863 So.2d at 205, 207; a patient who contracted HIV from a colonoscopy performed pursuant to inadequate procedures, *Spann*, 2012 WL 3776684, at *1 n. 2, *5; and a mother whose child suffered severe brain damage at birth because of improper prenatal and obstentrical care, *Carr v. Broward County*, 541 So.2d 92 (Fla.1989). And while these cases involve different statutory schemes arising from claims of medical malpractice, they underscore the rationale underlying all statutes of repose: "a statute of repose may cause injustice by eliminating a valid cause of action" balanced against what legislators have identified as legitimate "countervailing concern[s]—namely, the difficulty in defending against a lawsuit many years after the conduct at issue occurred." *Nehme*, 863 So.2d at 208–09.

Everyone in the courtroom appreciated the tragedy of Ms. Romero's situation. A healthy, young woman sustained catastrophic injury from an ordinary traffic accident. But tragic outcomes are not enough to avoid the unforgiving results of statutes of repose. Moreover, because this Court's jurisdiction rests solely upon the diversity of the parties, it owes special deference to the statutory law of the forum state as interpreted by its courts. *See* 28 U.S.C. § 1652; *Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120, 110 S.Ct. 456, 460, 107 L.Ed.2d 438 (1989) (noting that where the statutory text is clear, the court's task is "to apply the text, not to improve upon it").

For the reasons articulated above, the Court concludes that the Plaintiffs failed to introduce sufficient evidence to support a finding in their favor on the repose issue as it relates to their theory of defective roof design. The Court will grant Defendants' Renewed Motion for Judgment as a Matter of Law (DE 173) as to their affirmative defense pursuant to Federal Rule of Civil Procedure 50(b), setting aside the jury's determination of liability and damages and entering judgment in favor of Defendants.

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

---

**12.** In contrast to a statute of limitations, which procedurally limits a plaintiffs remedy at some point after the cause of action accrued (i.e., after the defendant breached a duty), statutes of repose "abolish[] or completely eliminate[] an underlying substantive right of action ... it is a substantive statute that not only bars enforcement of an accrued cause of action, but may also prevent the accrual of a cause of action when the final element necessary for its creation occurs beyond the time period established by the statute." *Adhin v. First Horizon Home Loans*, 44 So.3d 1245, 1253 (Fla.Dist.Ct.App.2010).

(1) Defendants' Renewed Motion for Judgment as a Matter of Law (DE 173) is **GRANTED.**

(2) The Court will issue an amended final judgment in accordance with this Order.

(3) The Clerk is directed to **CLOSE** this case for administrative purposes. Any and all pending motions are **DENIED AS MOOT.**